JOHNSON & WEAVER, LLP
Frank J. Johnson, Esq. (SBN 174882)
FrankJ@johnsonandweaver.com
Phong L. Tran, Esq. (SBN 204961)
PhongT@johnsonandweaver.com
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

Attorneys for Plaintiff
ERIK SAVINI

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIK SAVINI, Derivatively on Behalf of ACADIA PHARMACEUTICALS INC. | Case No.: '16 CV 2572 AJB KSC |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | DEMAND FOR JURY TRIAL |
| ULI HACKSELL; STEPHEN R. DAVIS; ROGER MILLS; STEPHEN R. BIGGAR; MICHAEL BORER; LAURA BREGE; MARY ANN GRAY; LESLIE L. IVERSEN; LESTER J. KAPLAN; TORSTEN RASMUSSEN; WILLIAM M. WELLS, | |
| Defendants, | |
| -and- | |
| Acadia Pharmaceuticals Inc. | |
| Nominal Defendant | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# **TABLE OF CONTENTS**

**Page**

I.  NATURE AND SUMMARY OF THE ACTION ....................................... 1

II.  JURISDICTION AND VENUE.................................................................... 7

III.  PARTIES............................................................................................................ 8

IV.  SUBSTANTIVE ALLEGATIONS ............................................................ 14

    A.  Acadia's Corporate Background and the New Drug Application (NDA) for NUPLAZID................................. 14

    B.  The Individual Defendants Delay the Submission of the NDA, but Continue to Maintain that Company was "On Track" to Submit the NDA By March 31, 2014 ............................ 19

V.  THE REASONS WHY THE STATEMENTS WERE IMPROPER ......... 26

VI.  THE TRUTH EMERGES .......................................................................... 27

VII.  INSIDER SELLING.................................................................................... 39

VIII.  DUTIES OF THE INDIVIDUAL DEFENDANTS.................................. 43

    A.  Fiduciary Duties.................................................................................. 43

    B.  Audit Committee Duties ................................................................... 44

    C.  Duties Pursuant to the Company's Code of Business Conduct and Ethics................................................... 46

    D.  Control, Access and Authority.......................................................... 49

    E.  Reasonable and Prudent Supervision............................................... 49

IX.  BREACHES OF DUTIES.......................................................................... 50

X.  CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ................................................................... 51

XI.  DAMAGES TO ACADIA ......................................................................... 52

XII.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ............... 53

    A.  Demand is Futile as Defendant Davis............................................. 55

    B.  Demand Is Excused as to Defendants Biggar and Brege Because They Also Face a Substantial Likelihood of Liability ...... 57

    C.  Demand is Futile as to Defendant Biggar and Director Baker for Additional Reasons ................................. 59

i

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

D.    Demand is Futile as to Defendant Brege for Additional Reasons ...................................................................... 61

E.    Demand is Futile as to Current Directors Soland, Daly and Harrigan for Additional Reasons ...................................... 63

F.    Demand is Futile as to the Current Directors for Additional Reasons ...................................................................... 66

COUNT I  Against the Individual Defendants for Breach of Fiduciary Duties.................................................................................... 67

COUNT II  Against the Individual Defendants for Unjust Enrichment ............. 68

COUNT III  Against the Individual Defendants For Waste Of Corporate Assets..................................................................................... 69

COUNT IV  Against the Insider Selling Defendants for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information ............................................................................... 70

COUNT V  Against All the Individual Defendants for Aiding and Abetting Fiduciary Violations .................................................. 70

PRAYER FOR RELIEF ....................................................................... 71

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

By and through his undersigned counsel, Plaintiff Erik Savini ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Acadia Pharmaceuticals Inc. ("Acadia" or the "Company") against certain current and former officers and directors of Acadia for breaches of fiduciary duties, unjust enrichment, corporate waste, and insider selling. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of his counsel, which includes, without limitation: (a) review and analysis of public filings made by the Company and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, earnings call transcripts and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, analyst reports, shareholder communications, and postings on the Company's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *Rihn v. Acadia Pharmaceuticals Inc., et al.*, Case No. 15cv00575 BTM (DHB) (S.D. Cal.) (the "Securities Class Action"); and (e) review of other publicly available information concerning Acadia and the Individual Defendants (defined below).

## I.      NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action seeking to redress wrongdoing by Acadia's board of directors (the "Board") and certain of its senior officers between November 10, 2014 and the present (the "Relevant Period"). During the Relevant Period, the Individual Defendants breached their fiduciary duties owed to Acadia and its shareholders and committed other violations of law by, *inter alia*, causing the Company to issue materially false and misleading statements and/or omit material information from its public filings and in communications with analysts and investors, the disclosure of which would have

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   made such filings and communications not misleading.  By and through the
2   Individual Defendants' violations of law, the Company has sustained and will
3   sustain damages.

4       2.      Headquartered in San Diego, California, Acadia is a
5   biopharmaceutical company that focuses on the development and
6   commercialization of innovative medicines for central nervous system disorders.

7       3.      Acadia's most promising drug candidate is NUPLAZID (the trade
8   name for pimavanserin), for which the Company has reported positive Phase III
9   pivotal trial results for the treatment of Parkinson's disease psychosis, or PDP.
10  As reported in Acadia's Annual Report for year ended December 31, 2014,
11  "NUPLAZID has the potential to be the first drug approved in the United States
12  for [PDP]."

13      4.      In April 2013, Acadia reported that the Food and Drug
14  Administration ("FDA") had concluded that the findings from the Company's
15  Phase III -020 study (the "020 Study") evaluating the efficacy, tolerability, and
16  safety of pimavanserin was sufficient to support the filing of a New Drug
17  Application ("NDA") for the treatment of PDP.  The submission of an NDA for
18  NUPLAZID was a critical step toward getting FDA approval for the drug and
19  ultimately preparing the drug for commercialization.  With this positive news,
20  the Company reported that it was "currently targeting an NDA submission **near**
21  **the end of 2014**."  On a conference call held on April 11, 2013, Defendant Roger
22  Mills ("Mills"), Acadia's then-Executive Vice President, Development, and
23  Chief Medical Officer, explained that before the Company could file the NDA
24  for NUPLAZID, it needed to complete "drug-drug interaction studies and final
25  aspects of CMC [chemistry, manufacturing and controls] development, including
26  stability testing of pimavanserin registration batches."

27      5.      On November 10, 2014, the start of the Relevant Period, Acadia
28  unexpectedly announced that it was delaying its submission of the NDA to the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   **first quarter of 2015**, or **by March 31, 2015**.  During a conference call held the
2   same day, Defendant Uli Hacksell ("Hacksell"), Acadia's then-Chief Executive
3   Officer and Board Member, told investors that "the decision to move back the
4   planned submission is based on additional time required to complete preparations
5   needed to support the FDA's review of NUPLAZID."  Defendant Hacksell
6   assured the market that the delay was "not really related to any kind of major
7   hurdles," but rather "[was] related to the fact that we have the decent
8   preparations that are required to support the FDA's review of NUPLAZID."
9   Hacksell also emphasized that the Company had already completed its "drug-
10  drug interaction program" and had "stability as required in [its] registration
11  program," and that the Company had "not [had] any kind of interactions with the
12  FDA that pushes this."

13      6.      In the following months during the Relevant Period, the Individual
14  Defendants caused Acadia to make numerous false and/or misleading
15  representations to the market that the Company was "*on track*" to submit the
16  NDA for NUPLAZID with the FDA by March 31, 2015.[1]  These false and/or
17  misleading representations include the following:

18          (a)     On December 2, 2014, Defendant Stephen Davis ("Davis"),
19  Acadia's then-Chief Financial Officer, Executive Vice President, and
20  Chief Business Officer, stated that with respect to the NDA "***what we've***
21  ***guided is the first quarter of 2015, and we remain on track for that***."

22          (b)     On January 13, 2015, Defendant Hacksell reported that
23  Acadia was "***comfortable***" with its timeline for submitting the NDA by
24  March 31, 2015.

25  ───────────────
26  [1] Emphasis added unless otherwise noted throughout.  The statements made or
    authorized by the Individual Defendants that ***are bolded and italicized*** are the
27  statements alleged to be false and misleading.  Additional statements are **bolded**
    (and not italicized) for emphasis.
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1        (c)    On February 26, 2015, the Individual Defendants caused the

2   issuance of a press release on Acadia's behalf, in which Defendant

3   Hacksell was quoted as saying that Acadia "***remain[s] on track to submit***

4   ***our New Drug Application to the FDA in the first quarter of 2015***."

5        (d)    During a conference call held on February 26, 2015,

6   Defendant Hacksell reiterated his statements in the press release, stating:

7   "***we remain on track to submit our NDA this quarter***."

8        (e)    During the same February 26, 2015 conference call,

9   Defendant Mills also confirmed: "As Uli mentioned at the beginning of the

10   call, we are diligently completing preparations to support the FDA review

11   of Nuplazid and ***remain on track to submit our NDA this quarter***."

12       7.    As a result of these materially false statements and omissions,

13   Acadia's stock price traded at artificially inflated levels during the Relevant

14   Period. Notably, certain of the Individual Defendants exploited their positions as

15   corporate fiduciaries of Acadia and capitalized on the Company's inflated stock

16   prices to sell their personal stock holdings for millions in proceeds. In particular,

17   Defendants Hacksell and Mills, along with Acadia Board members Michael

18   Borer ("Borer"), Laura Brege ("Brege"), Mary Ann Gray ("Gray") and Torsten

19   Rasmussen ("Rasmussen"), sold their stock holdings in Acadia during the

20   Relevant Period for proceeds of more than **$8.1 million.** The bulk of these

21   insider sales occurred when the Company's stock price was most inflated.

22       8.    The Individual Defendants knew at the time, but did not disclose to

23   the market, that Acadia was not prepared and not "on track" to submit the NDA

24   for NUPLAZID by March 31, 2015, as was repeatedly represented during the

25   Relevant Period. In fact, the Individual Defendants were well aware that the

26   Company had failed to ensure that certain of its manufacturing and quality

27   assurance systems and those of its third-party manufacturers and suppliers were

28   in compliance with Current Good Manufacturing Practices ("CGMP" or

4

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  "CGMPs"), as required by federal regulation.  Due to Acadia's failure to

2  complete the necessary systems preparation pursuant to the CGMPs, it was

3  impossible for the Company to timely submit the NDA for NUPLAZID by the

4  March 31, 2015 deadline.

5  　　　9.　　The Individual Defendants' false narrative that Acadia was on track

6  for the timely submission of the NDA began to unravel when the Company

7  announced on March 11, 2015 that it was again delaying the submission—**this**

8  **time to the second half of 2015.**  Incredibly, the March 11, 2015 announcement

9  of the new delay came less than two weeks after both Hacksell and Mills

10  provided assurances to the market that the Company remained on track to meet

11  the deadline.

12  　　　10.　　In a separate press release issued that same day, Acadia also

13  announced the abrupt "resignation" of Defendant Hacksell, who had served as

14  the Company's CEO since 2000.  The Company further announced the

15  appointment of Defendant Davis as interim CEO.

16  　　　11.　　In the March 11, 2015 press release announcing the new delay,

17  Acadia's management finally confirmed that the decision to further delay the

18  NDA submission was "based on additional time required to complete the

19  preparation of systems to support commercial manufacturing and supply and, in

20  turn, to support the U.S. Food and Drug Administration's (FDA) review of

21  Nuplazid."

22  　　　12.　　On a conference call held the same day, Defendant Davis further

23  explained the reasons for the new delay, stating that the Company "completed an

24  assessment" of its "manufacturing quality systems and procedures," and

25  "determined that we need to do additional work to prepare our systems to support

26  commercial-scale manufacturing and supply" to be ready for the FDA's review

27  of those systems.  The "manufacturing and supply systems," Davis noted, "are

28  subject to inspection as part of the NDA review process."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

13.     Defendant Davis also remarked during the conference call that properly establishing these systems requires "close coordination between [Acadia's] internal manufacturing resources, external third-party suppliers and the quality assurance functions within each organization." To be ready for the FDA's review of those systems, the Company needed to test and evaluate them, which according to Davis, "requires coordination of our schedule with the schedules and availability of others and the logistics, quite frankly, can be challenging."

14.     Following the shocking announcement of the new delay in the NDA submission and the Company's explanation for the delay, the price of Acadia's stock fell $9.94 to close at $34.82 per share on March 12, 2015—a one-day decline of 22%.

15.     The Individual Defendants' false and materially misleading statements (and other wrongdoing such as the failure to implement, maintain, or follow adequate internal controls) caused Acadia's stock to trade at artificially inflated levels during the Relevant Period. However, after the revelations concerning Acadia's inability to meet the March 31, 2015 deadline to submit the NDA for NUPLAZID seeped into the market, the Company's stock was hammered by massive sales, driving down the share price from its artificially inflated highs, erasing hundreds of millions of dollars of the Company's market capitalization.

16.     As a result of the Individual Defendants' wrongdoing, Acadia shareholders filed the Securities Class Action on March 13, 2015. On September 9, 2016, District Court Judge Barry Ted Moskowitz of the Southern District of California issued an order denying defendants' motion to dismiss in its entirety, expressly holding that plaintiffs in that case have satisfied the difficult pleading standards of Fed. R. Civ. Proc. 9(b), and the Private Securities Litigation Reform Act ("PLSRA").

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

17.   As a consequence of the Individual Defendants' wrongdoing, Acadia has been severely harmed.  Not the least among these harms will be the costs of defending the Securities Class Action, as well as paying any judgment or verdicts against the Company or its principal officers in those actions.  Acadia has also been damaged in its reputation, goodwill, and standing in the biopharmaceutical industry.

18.   The Company's Board has not and will not commence litigation against the Individual Defendants named in this complaint, let alone vigorously prosecute such claims because they face a substantial likelihood of liability to Acadia for authorizing or failing to correct the false and misleading statements alleged herein, and for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred.  Accordingly, a pre-suit demand upon the Board is a useless and futile act.  Thus, Plaintiff rightfully brings this action to vindicate the Company's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Acadia.

## II.   JURISDICTION AND VENUE

19.   The Court has jurisdiction over all claims under 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.   The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in California, or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

21.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains executive offices in this District, including Nominal Defendant Acadia, a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violations of fiduciary duties owed to Acadia— occurred in this District, and the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

22.   In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

### III.   PARTIES

23.   Plaintiff Savini began purchasing shares in Acadia common stock in 2011.   Savini has continuously held shares of Acadia common stock at all relevant times including during the Relevant Period, and continues to hold Acadia common stock.   Plaintiff Savini is a citizen of Pennsylvania.

24.   Nominal Defendant Acadia is incorporated in Delaware, with its principal place of business located at 3611 Valley Centre Drive, Suite 300, San Diego, California, 92130.   Acadia is a biopharmaceutical company that develops and commercializes new medicines to address unmet medical needs in central nervous system disorders.

25.   Defendant Hacksell was the CEO and a director of Acadia, until his resignation on March 11, 2015.   Hacksell continued to be employed as a consultant with the Company, until his recent departure on September 11, 2016. Hacksell is a defendant in the Securities Class Action.   In 2014, Hacksell

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

received a base salary of $580,000, a bonus of $208,800, and an options award worth $5,074,725. In 2015, Hacksell received a salary of $120,833, in addition to "other" compensation worth $408,510. During the Relevant Period, while in possession of material, non-public information, Hacksell sold at least 120,000 personally held shares of Acadia stock at artificially inflated prices for proceeds of more than $3.85 million. Hacksell also signed and/or certified SEC filings containing false and misleading statements, including the Company's Annual Report for FY 2014 filed on Form 10-K on February 26, 2015. He additionally certified that "the information contained in the Report fairly presents, in all material respects, the financial condition of the Company at the end of the period covered by the Report and results of operations of the Company." Based upon information and belief, Hacksell is a citizen of California.

26. Upon Hacksell's resignation, Defendant Davis was appointed interim CEO of Acadia on March 11, 2015, and then formally appointed CEO and President on September 3, 2015. Davis was also appointed to the Board on September 3, 2015. Davis previously served as Acadia's CFO, Executive Vice President, and Chief Business Officer. Davis is a defendant in the Securities Class Action. In 2014, Davis received a base salary of $191,805, a bonus of $53,802, and an options award worth $4,963,008. In 2015, Davis received a salary of $507,452, a bonus of $248,651, an options award worth $11,276,193, and "other" compensation worth $100,770. Davis, as CFO, signed and/or certified SEC filings containing false and misleading statements, including the Company's Annual Report for FY 2014 filed on Form 10-K on February 26, 2015. He additionally certified that "the information contained in the Report fairly presents, in all material respects, the financial condition of the Company at the end of the period covered by the Report and results of operations of the Company." Based upon information and belief, Davis is a citizen of California.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

27. During the Relevant Period, Defendant Mills was Acadia's Executive Vice President of Development and Chief Medical Officer, until his resignation on November 4, 2015. Mills is a defendant in the Securities Class Action. In 2014, Mills received a base salary of $425,000, a bonus of $119,000, and an options award worth $3,146,330. In 2015, Mills received a salary of $372,356, an options award worth $4,466,232, and "other" compensation worth $73,344. During the Relevant Period, while in possession of material, non-public information, Mills sold at least 25,000 personally held shares of Acadia stock at artificially inflated prices for proceeds of more than $752,000. Based upon information and belief, Mills is a citizen of California.

28. Defendant Stephen R. Biggar ("Biggar") has been director of the Company since 2013 and currently serves on the Board. Biggar was appointed Chairman of Acadia's Board in June 2016. Biggar is also a principal of Baker Brothers Advisors LP, a registered investment advisor and hedge fund purportedly focused on long-term investments in life-sciences companies. Biggar also serves as a director for Synageva BioPharma Corp., a publicly traded biotechnology company. During the Relevant Period, Biggar signed SEC filings containing false and misleading statements, including the Company's Annual Report for FY 2014 filed on Form 10-K on February 26, 2015. Based upon information and belief, Biggar is a citizen of New York.

29. Defendant Borer served as a director of the Company since 2005, until his resignation on February 18, 2016. During the Relevant Period, Borer was a member of the Audit Committee. Borer signed SEC filings containing false and misleading statements, including the Company's Annual Report for FY 2014 filed on Form 10-K on February 26, 2015. During the Relevant Period, while in possession of material, non-public information, Borer sold approximately 42,973 personally held shares of Acadia stock at artificially inflated prices for proceeds of more than $1.37 million. During the Relevant

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Period, Borer signed SEC filings containing false and misleading statements,
2   including the Company's Annual Report for FY 2014 filed on Form 10-K on
3   February 26, 2015. Based upon information and belief, Borer is a citizen of
4   Colorado.

5       30.   Defendant Brege has been a director of the Company since 2008
6   and continues to serve on the Board. During the Relevant Period, Brege was a
7   member of the Audit Committee. Brege also currently serves as CEO and
8   President of Nodality, Inc., a private company focused on personalized medicine.
9   Brege also currently sits on the boards of directors of public companies Pacira
10  Pharmaceuticals, Inc., Portola Pharmaceuticals, Inc., and Dynavax Corporation.
11  During the Relevant Period, Brege signed SEC filings containing false and
12  misleading statements, including the Company's Annual Report for FY 2014
13  filed on Form 10-K on February 26, 2015. During the Relevant Period, while in
14  possession of material, non-public information, Brege sold at least 10,000
15  personally held shares of Acadia stock at artificially inflated prices for proceeds
16  of approximately $336,349. Based upon information and belief, Brege is a
17  citizen of California.

18      31.   Defendant Gray served as a director of the Company since 2005,
19  until her resignation from the Board on April 27, 2016. During the Relevant
20  Period, Gray served as the Chair of the Audit Committee. Gray also served as
21  President of Gray Strategic Advisors, LLC, a company she started in 2003,
22  which provides strategic consulting services to the biotechnology industry. Gray
23  signed SEC filings containing false and misleading statements, including the
24  Company's Annual Report for FY 2014 filed on Form 10-K on February 26,
25  2015. Also, during the Relevant Period, while in possession of material, non-
26  public information, Gray sold at least 16,500 personally held shares of Acadia
27  stock at artificially inflated prices for proceeds of approximately $537,565.
28  Based upon information and belief, Gray is a citizen of New York.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

32.   Defendant Leslie L. Iversen ("Iversen") served as the Chairman of the Board of Directors since 2000, until he declined to stand for Board reelection on April 27, 2016.  Iversen was a founding member of the Company's Scientific Advisory Board.  During the Relevant Period, Iversen served as the Chair of the Audit Committee.  Iversen signed SEC filings containing false and misleading statements, including the Company's Annual Report for FY 2014 filed on Form 10-K on February 26, 2015. Based upon information and belief, Iversen is a citizen of the United Kingdom.

33.   Defendant Lester J. Kaplan ("Kaplan") served as a director of the Company since 1997, until his resignation from the Board on November 6, 2015. During the Relevant Period, Kaplan was the Chair of the Compensation Committee and member of the Nominating and Corporate Governance ("NCG") Committee.  Kaplan also was the Executive Chairman of the Board of Aciex Therapeutics Inc., and a member of the boards of directors of Neurotech Pharmaceuticals, Inc. and The Foundation Fighting Blindness Clinical Research Institute.  Kaplan also served on the Scientific Advisory Board of Bay City Capital.  Kaplan signed SEC filings containing false and misleading statements, including the Company's Annual Report for FY 2014 filed on Form 10-K on February 26, 2015.  Based upon information and belief, Kaplan is a citizen of Colorado.

34.   Defendant Rasmussen served as a director of the Company since 1998, until his resignation from the Board on December 11, 2015.  During the Relevant Period, Rasmussen was the Chair of the NCG Committee and member of the Compensation Committee.  Rasmussen was also the President and Chief Executive Officer of Morgan Management ApS, a management advisory and consulting company, which he founded in 1997.  Rasmussen signed SEC filings containing false and misleading statements, including the Company's Annual Report for FY 2014 filed on Form 10-K on February 26, 2015.  During the

12

1  Relevant Period, while in possession of material, non-public information,
2  Rasmussen sold at least 31,752 personally held shares of Acadia stock at
3  artificially inflated prices for proceeds of approximately $1.1 million.  Based
4  upon information and belief, Rasmussen is a citizen of Denmark.

5      35.    Defendant William M. Wells ("Wells") served as a director of the
6  Company since 2012, until he declined to stand for Board reelection on April 27,
7  2016.  During the Relevant Period, Wells was a member of the NCG Committee.
8  Wells also served as Chairman of the Board of Evizone Ltd., a privately-held
9  online communications service firm, and as a member of the boards of directors
10 of EnerCare Inc. and Medgenesis Therapeutix Inc.  Wells signed SEC filings
11 containing false and misleading statements, including the Company's Annual
12 Report for FY 2014 filed on Form 10-K on February 26, 2015.  During the
13 Relevant Period, while in possession of material, non-public information, Wells
14 sold at least 5,810 personally held shares of Acadia stock at artificially inflated
15 prices for proceeds of more than $168,000.  Based upon information and belief,
16 Wells is a citizen of Vermont.

17     36.    Defendants identified in ¶¶ 25-35 are sometimes referred to herein
18 as the "Individual Defendants."  Defendants identified in ¶¶ 29-32 are sometimes
19 referred to herein as the "Audit Committee Defendants."  Defendants identified
20 in ¶¶ 25, 27, 29-31, 34-35 are sometimes referred to herein as the "Insider Selling
21 Defendants."

22     37.    "Current Directors" refer to the current members of the Board as of
23 the filing of this complaint, including Defendant Biggar, Defendant Brege,
24 Defendant Davis, Julian C. Baker ("Baker"), Jim Daly ("Daly"), Edmund P.
25 Harrigan ("Harrigan"), and Daniel B. Solund ("Solund").  Baker, Daly, Harrigan
26 and Solund are not named as Defendants herein.

27     38.    As directors and/or officers of Acadia, the Individual Defendants
28 either knew, consciously disregarded, were reckless and grossly negligent in not

13

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

knowing, or should have known the adverse, non-public information about Acadia's financial condition, business and growth prospects, and outlook, including the adverse information regarding timing of the submission of the NDA for its most promising drug candidate, NUPLAZID, because of their access to internal corporate documents, conversations, and connections with one another as well as other corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to them in connection therewith. The Individual Defendants either participated in, caused, failed to correct, and/or failed to take action to remedy the harm inflicted upon Acadia through the issuance of the improper statements disseminated via press releases, SEC filings, and other means to the press, securities analysts, and Acadia shareholders

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Acadia's Corporate Background and the New Drug Application (NDA) for NUPLAZID

39.   Acadia is a biopharmaceutical company that focuses on the development and commercialization of innovative medicines that are intended to address unmet medical needs in central nervous system disorders. Acadia has a portfolio of product opportunities led by novel drug candidate, NUPLAZID (the trade name for pimavanserin), which is intended to be used for the treatment of Parkinson's disease psychosis ("PDP"). PDP is a common, but serious symptom of Parkinson's disease, causing people those with the disease to suffer hallucinations and delusions. Acadia holds the worldwide commercialization rights to NUPLAZID.

40.   As set forth in Acadia's Annual Report for year ended December 31, 2014, filed on Form 10-K with the SEC on February 26, 2015, the Company reported "positive Phase III pivotal trial results in PDP and believe NUPLAZID has the potential to be the first drug approved in the United States

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

for this disorder."

41. On April 11, 2013, Acadia issued a press release announcing that the FDA had agreed that the data from the Company's 020 Study, along with supportive data, were sufficient to support the filing of an NDA with the FDA for the treatment of PDP. The press release provided in relevant part:

> ACADIA Pharmaceuticals Inc. (NASDAQ: ACAD), a biopharmaceutical company focused on innovative treatments that address unmet medical needs in neurological and related central nervous system disorders, today announced that the U.S. Food and Drug Administration (FDA) has agreed that the data from the pivotal Phase III -020 study, together with supportive data from other studies with pimavanserin, are sufficient to support the filing of a New Drug Application (NDA) for the treatment of Parkinson's disease psychosis (PDP). As a result, ACADIA will no longer conduct the Phase III -021 study that was planned as a confirmatory trial and was scheduled to be initiated later this month.

> ACADIA is currently focused on completing the remaining elements of its pimavanserin PDP development program that are needed for submission of an NDA. These include customary supportive studies, such as drug-drug interaction studies, and CMC development, such as stability testing of registration batches. Subject to changes that could result from future interactions with the FDA or other developments, ACADIA is currently targeting an NDA submission near the end of 2014. While the FDA has agreed to accept and review an NDA for pimavanserin on the basis of ACADIA's positive pivotal -020 study, along with supportive efficacy and safety data from other pimavanserin studies, the NDA will be subject to a standard FDA review to determine whether the filing package is adequate to support approval of pimavanserin for PDP.

> "We are very pleased with the outcome of our meeting with the FDA, which we expect will reduce substantially both the time and cost of our PDP development program," said Uli Hacksell, Ph.D., ACADIA's Chief Executive Officer. "This represents another important step toward our goal of bringing pimavanserin to the market as an innovative therapy for Parkinson's patients who suffer from the psychosis frequently associated with this disease."

42. Due to the success of the 020 study, the Individual Defendants decided to forego the second Phase III -021 study (the "-021 Study"), which was previously planned as a confirmatory trial and scheduled to be initiated that month. During a conference call with investors and analysts held the same day on April 11, 2013, Defendant Hacksell explained that by foregoing the 021 Study, the Company "saved a considerable amount of time, perhaps up to a

15

1  year, by having this expedited path to the NDA."

2      43.    The submission of an NDA for NUPLAZID was a critical step
3  toward getting approval from the FDA for the drug and ultimately preparing the
4  drug for commercial launch.  An NDA is the formal application through which a
5  pharmaceutical company proposes that the FDA approve a new pharmaceutical
6  for sale and marketing in the United States.  After an NDA is submitted to the
7  FDA, the FDA has 60 days to decide whether to file it so that the application can
8  be reviewed.  Under 21 C.F.R. § 314.101(d)(3), the FDA may refuse to file an
9  application if it "is incomplete because it does not on its face contain information
10  required under section 505(b), section 505(j), or section 507 of the act and
11  314.50 or 314.94."

12      44.    The requirements for the content and format of an NDA are set forth
13  in 21 C.F.R. § 314.50.  Pursuant to that regulation, each NDA must include
14  certain technical sections, each of which "is required to contain data and
15  information in sufficient detail to permit the agency to make a knowledgeable
16  judgment about whether to approve the application or whether grounds exist
17  under section 505(d) of the [FDCA] to refuse to approve the application."
18  21 C.F.R. § 314.50.

19      45.    The required technical sections of an NDA include, *inter alia*, the
20  (a) chemistry, manufacturing, and controls ("CMC") section; (b) the nonclinical
21  pharmacology and toxicology section (21 CFR § 314.50(d)(2)); (c) the human
22  pharmacokinetics and bioavailability section (21 CFR §314.50(d)(3)); and (d) the
23  clinical data section, including controlled human studies (21 C.F.R. § 314.50(d)).

24      46.    Furthermore, as part of the NDA submission process, Acadia was
25  required to demonstrate that its manufacturing and quality assurance systems, as
26  well as the corresponding systems of its third-party contract manufacturers and
27  suppliers, complied with CGMPs, as set forth in 21 C.F.R. §§ 210, 211.  These
28  CGMP regulations specifically require drug manufacturers "to establish and

16

1  follow scientifically sound and appropriate written controls for specifications,

2  plans, and procedures that direct operational and quality system activities and to

3  ensure that these directives are accurate, appropriately reviewed and approved,

4  and available for use."   Under 21 CFR § 211.22(a)-(d), the manufacturer's

5  quality control unit must follow "responsibilities and procedures . . . . [which]

6  shall be in writing."

7       47.   In addition, the CGMP regulations provide that the "FDA may

8  refuse to approve an application" if "[t]he methods to be used in, and the

9  facilities and controls used for, the manufacture, processing, packing, or holding

10  of the drug substance or the drug product do not comply with the current good

11  manufacturing practice regulations in parts 210 and 211."   See 21 C.F.R.

12  § 314.125(b)(13).

13       48.   To determine whether an applicant's manufacturing facilities

14  comply with CGMP regulations, the FDA typically conducts a pre-approval

15  inspection.  Pre-approval inspections are conducted to evaluate the readiness of

16  commercial manufacturing, conformance to application, and data integrity audit.

17  If the manufacturing facilities are not ready for inspection, the FDA may refuse

18  to file the application.  Accordingly, even before the FDA accepts an NDA for

19  review, the failure of an applicant to ensure that its manufacturing facilities are

20  prepared for inspection can cause significant delays in the NDA approval

21  process**.**

22       49.   During the April 11, 2013 conference call, Acadia's management

23  discussed the tasks the Company needed to complete before it could submit the

24  NDA to the FDA.  Defendant Mills, Acadia's Chief Medical Officer at the time,

25  explained that before submitting NDA, the Company needed to complete

26  "additional NDA-enabling studies, including drug-drug interaction studies" and

27  "CMC studies that are required for approval."  The drug-drug interaction studies

28  and CMC studies described by Mills were part of the CMC requirements set

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    forth in 21 C.F.R. § 314.50(d)(1)(i), (ii), discussed above at ¶ 45.

2        50.    A few weeks later on April 30, 2013, members of Acadia's senior

3    management attended and presented at the Needham Healthcare Conference.

4    During the conference, Defendant Hacksell stated that the Company was close to

5    completing its CMC activities and moving forward with the preparation and

6    submission of the NDA.  According to Hacksell, an important CMC activity that

7    still needed to be completed was the Company's assessment of stability of

8    regulatory batches.  Hacksell stated in relevant part:

9            So, with this outcome of our FDA discussion, we can now move
10           aggressively forward towards assembling the NDA. We hope to be
             able to submit the NDA near the end of 2014. What remains to be
11           done for us is CMC activities, including assessment of stability of
             regulatory batches. I should mention to you that the CMC area, we
12           have things remaining to do, but we don't see any risks in the
             remaining activities, because we have already done a lot of stability
13           work.

14           When it comes to a submission of an NDA, you need to do certain
             things, and to check the boxes and that's what we're doing here.  We
15           also need to do some standard drug-drug interaction studies. Those are
             also essentially checking the remaining boxes. So we feel very
16           confident about the remaining development program of pimavanserin.
             But it will take some time. The good thing for us is that we can move
17           forward much quicker than we would have done otherwise, if we had
             been required to do an additional clinical study -- an additional pivotal
18           study, I should say.
                                     *        *        *

19           [Audience Member]: Can you talk about additional things that you
20           have to do and the time line –

21           [Defendant Hacksell]:   Yes, what remains to be done for us is
             basically completing the CMC program, and that includes stability
22           testing of the regulatory batches. Just to make sure that you
             understand, there is a lot of formality that you do, complete the CMC
23           program. And so that's what we have as a critical timeline to NDA
             submission. To check all the boxes that are required for that.

24       51.    On August 5, 2014, Acadia hosted a second quarter earnings call

25   during which management reported that the Company was progressing with its

26   CMC activities and that it planned to submit the NDA toward the **end of 2014**.

27   Defendant Mills stated in relevant part:

28

During the second quarter, we held routine pre-NDA meetings with the FDA. These interactions are positive and enabled us to outline and discuss our planned submission and how the NDA would be organized. **Based on these positive interactions, we remain on track for the planned NDA submission to the end of 2014**.

Importantly, our team has remained focused on completing the remaining activities in our pimavanserin PDP development program that are needed for the submission of our NDA. This includes aspects of the CMC development, including stability testing of the pimavanserin registration batches and supported studies including drug-drug interaction studies.

I am pleased to report that our CMC program has continued to advance as planned. You may recall that our three required registration batches of pimavanserin were successfully manufactured at the commercial launch scale and registration of stability testing on these drug product batches was initiated last October.

During the second quarter, we completed an assessment on the first six months of stability data from these registration lots and, importantly, confirmed that these data are consistent with historical data observed with our clinical trials formulation. We are continuing to accumulate data in our registration stability program, which is designed to comply with the ICH guidelines of 12-month stability of regulatory batches and to meet the regulatory filing requirements for major markets worldwide.

**B.     The Individual Defendants Delay the Submission of the NDA, but Continue to Maintain that Company was "On Track" to Submit the NDA By March 31, 2014**

51.     On November 10, 2014, the start of the Relevant Period, the Individual Defendants caused Acadia to issue a press release, announcing that the Company would not be submitting the NDA by the end of 2014 as previously planned, but instead would be submitting the NDA by March 31, 2015.   The Company explained that the decision to push back the deadline for the submission of the NDA was "based on additional time required to complete preparations needed to support the [FDA's] review of NUPLAZID."   The press release stated in relevant part:

> *ACADIA plans to submit its NUPLAZID NDA for Parkinson's disease psychosis in the first quarter of 2015.* The company had previously planned to submit the NDA near the end of 2014. The decision to move back the planned submission is based on additional time required to complete preparations needed to support the U.S.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Food and Drug Administration's (FDA) review of NUPLAZID. The change in submission timing is not a result of any change to NUPLAZID's clinical or safety profile, nor is it a result of any interaction with or request for information from the FDA. Additionally, ACADIA reported that it has successfully completed its drug-drug interaction program and its registration stability program.

"While we had hoped to submit our NDA for NUPLAZID near the end of this year, we believe it is prudent to push back our planned submission to the first quarter of 2015," said Uli Hacksell, Ph.D., Chief Executive Officer of ACADIA. "We are confident in our safety and efficacy data package supporting the NUPLAZID NDA and are working diligently on completing preparations for the NDA submission and review."

52.     That same day, the Individual Defendants caused the Company to host a conference call with investors and analysts to discuss the revised timeline for submitting the NDA.  During the conference call, Defendant Hacksell assured investors that the Company was making progress toward submitting the NDA in the first quarter of 2015 and that the Company had "completed the drug-drug interaction program," and had the "stability as required in our registration program," but "need[s] some more time to complete the preparations."  Hacksell provided the following relevant commentary:

[Defendant Hacksell]:     *In summary, we are working diligently on moving the NUPLAZID program toward registration, preparing for submission of the NDA in the first quarter of 2015, followed by a submission of an MAA in Europe six to nine months thereafter*.

We continue to make important progress in building our commercial capabilities, and on the development side, we are actively pursuing a number of indications in which pimavanserin may represent a novel approach to treating certain disorders. We continue to make important additions to our team and are putting significant effort into hiring high quality and experienced leaders as we build out key areas of the organization to manage the planned launch and commercialization on NUPLAZID.

*         *         *

[Analyst]: Thanks for taking the questions. The first one I have for you is regarding NDA timing. And this is something that has been in the works with a similar timeline on it for quite a while now. So I guess I'm trying to get a little bit of a better understanding of why do you need this extra time at this point, even though it's still a relatively short amount of time. Are there additional analyses that you decided

20

to do after meeting with the FDA or as part of the submission you sent them to get the breakthrough designation?

[Defendant Hacksell]: ***So what we really can say is that the timing change is related to the fact that we have additional preparations that are required to support the FDA's review of NUPLAZID, and that is not really related to any kind of major hurdles. We have completed the drug-drug interaction program. We have stability as required in our registration program. We have not any kind of interactions with the***

***FDA that pushes this. It's just that we need some more time to complete the preparations. It is just a timing issue, nothing else***.

\*       \*       \*

[Analyst]: It doesn't appear to be a big deal in the grand scheme of things, but I am wondering if the timing with regard to the NDA is related to any new observation with regard to that drug-drug interaction study or the stability work that you have been doing, or is this simply a Gantt chart thing where you are preparing the submission for making the submission?

[Defendant Mills]: So I think you probably hit it in the last bit there. With regard to the data, we have got no data that would suggest we have developed any problem with the clinical data with the drug product. All those things have gone according to plan, not just the drug-drug interactions, but the stability program, all have gone pretty smoothly. Importantly, looking at the safety profile of the drug, it really continues to be very consistent with everything we have seen in the past and, obviously, with the basis of that was really the submission that we made to FDA, and there is nothing changed in terms of the risk-benefit of the drug.

[Defendant Hacksell]: So I think you expressed it pretty well. It's just a matter of timing. You can call it a Gantt chart, if you wish.

53.     In the months that followed, the Individual Defendants continued to provide false assurances to the market that Acadia was "on track" to submit the NDA by March 31, 2015, as represented.  On December 2, 2014, the Individual Defendants caused Acadia to present at the Piper Jaffray Healthcare Conference, during which Defendant Davis told investors that the Company remained on track for submitting the NDA by March 31, 2015:

[Analyst]: . . . NDA filing is soon?

[Defendant Davis]: ***Yes. What we've guided is the first quarter of 2015, and we remain on track for that.***

21

54.   On January 13, 2015, the Individual Defendants caused Acadia to present at the JPMorgan Healthcare Conference, during which Defendant Hacksell reiterated his confidence in submitting the NDA by the first quarter of 2015:

> [Audience Member]: . . . You reiterated your guidance in your talk just now about filing the pimavanserin NDA this first quarter. So considering we are in the first quarter, is it safe to assume no more obstacles with whatever the issue was that pushed it off? And do you feel comfortable it has been addressed?
>
> [Defendant Hacksell]: ***Yes. The question is if we feel comfortable with submitting the NDA this quarter and the answer is yes, we do.***

55.   On February 24, 2015, Acadia announced in a press release that it would be presenting at two upcoming investor conferences in March: the Cowen and Company 35th Annual Health Care Conference on March 3, 2015, and the 27th Annual ROTH Conference on March 10, 2015.

56.   On February 26, 2015, the Individual Defendants caused Acadia to issue a press release announcing the Company's fourth quarter and year-end financial results for 2014.  The Company reported a net loss of $28.4 million, or ($0.28) diluted earnings per share ("EPS"), and collaborative revenue of $47,000 for the fourth quarter of 2014.   The Company also reported a net loss of $92.5 million, or ($0.95) diluted EPS, and collaborative revenue of $120,000 for the year ended December 31, 2014.   The press release again assured investors that the Company was on track to submit the NDA by the first quarter of 2015:

> "Our accomplishments in 2014, highlighted by NUPLAZIDTM receiving Breakthrough Therapy designation from the FDA, our strengthened balance sheet, and our commercial preparations, set the stage for a promising 2015," said Uli Hacksell, Ph.D., Chief Executive Officer of ACADIA. "Importantly, we continue to advance our Parkinson's disease psychosis program towards registration and ***remain on track to submit our New Drug Application to the FDA in the first quarter of 2015."***

57.   That same day, the Individual Defendants caused Acadia to host a conference call with analysts and investors, during which Defendants Hacksell

and Mills continued to maintain the story that Acadia was on track to submit the NDA by the first quarter of 2015:

> [Defendant Hacksell]: Our performance in 2014 was highlighted by a number of important achievements. During 2014, we continued to advance our NUPLAZID program for the treatment of Parkinson's disease psychosis, or PDP, towards registration and *we remain on track to submit our NDA this quarter.*
>
> We successfully completed our drug-drug interaction program and our stability program for registration batches. We also held successful pre-NDA meetings with the FDA.
>
> *       *       *
>
> [Defendant Mills]: . . . As Uli mentioned at the beginning of the call, we are diligently completing preparations to support the FDA review of NUPLAZID and *remain on track to submit our NDA this quarter*.
>
> *       *       *
>
> [Defendant Hacksell]: Thank you Terry. The stage is set for what I believe will be a very exciting year at ACADIA and we're off to a strong start in 2015. Our priorities are clear. *We plan to submit our NDA for NUPLAZID during the first quarter of 2015,* continue to build out our commercial capabilities to prepare for the planned launch of NUPLAZID, and we will pursue the development of pimavanserin for other neurological and psychiatric disorders that are underserved by currently available antipsychotic drugs. We also will prepare a submission for NUPLAZID in Europe.
>
> As far as our organization, we are expanding our existing infrastructure to support the planned launch and commercialization of NUPLAZID, including adding to our commercial structure, commercial level manufacturing, medical affairs, quality control and compliance. We have brought in highly qualified individuals with extensive experience in their functional domain and in CNS products. I am thrilled to see the high level of collaboration across functions.

58.     Also on February 26, 2015, the Individual Defendants caused Acadia to file its Annual Report on Form 10-K for the fiscal year 2014 ("2014 10-K"), which was signed by Defendants Hacksell, Davis, Iversen, Biggar, Borer, Brege, Gray, Kaplan, Rasmussen, and Wells.  Once again, the Individual Defendants confirmed in the 2014 10-K that the Company was on track to submit the NDA by the first quarter of 2015.  The 10-K also provided details on the manufacturers and other third-parties that the Company planned to use to bring NUPLAZID to market.  The 2014 10-K stated in relevant part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*We plan to submit the NDA to the FDA in the first quarter of 2015.*

\*   \*   \*

We currently outsource, and plan to continue to outsource, manufacturing responsibilities for our existing and future product candidates, including NUPLAZID, for development and commercial purposes. Until recently, NUPLAZID has been manufactured in small quantities for preclinical studies and clinical trials. If NUPLAZID is approved for commercial sale, we will need to manufacture the product in larger quantities. Significant scale-up of manufacturing requires additional process development and validation studies, which will be subject to FDA review as part of our NDA submission. Our active pharmaceutical ingredient, or API, has been manufactured in Switzerland for over ten years and we anticipate continuing to use this manufacturer as we transition to a commercial organization.

We plan to retain third-party service providers to perform a variety of functions related to the distribution of NUPLAZID, including warehousing, customer service, order-taking, invoicing, collections, and shipment and returns processing.

59.     Notably, the 2014 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2001 ("SOX") signed by Defendants Hacksell and Davis, in their respective capacities as CEO and CFO, stating that the 10-K "fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934" and "the information contained in the Report fairly presents, in all material respects, the financial condition of the Company at the end of the period covered by the Report and results of operations of the Company for the period covered by the report."  Defendants Hacksell and Davis further signed a separate certification stating, in relevant part:

1. I have reviewed this annual report on Form 10-K for the year ended December 31, 2014 of ACADIA Pharmaceuticals Inc.

2. ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under   our supervision,   to provide reasonable assurance regarding the reliability of financial reporting and the       preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)   disclosed in this report any change in the registrant's internal control over     financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability   to record, process, summarize and report financial information; and

b) any fraud,whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

60.   The market responded positively to the false and misleading statements issued by the Individual Defendants that Acadia remained "on track"

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

to submit the NDA for NUPLAZID by March 31, 2015. Indeed, on the strength of the foregoing false and misleading statements, the Company's stock traded at artificially inflated prices, reaching a high of $45.88 per share on March 10, 2015.

61. Despite the positive update in the Company's February 26, 2015 public statements, less than a week later the Company cancelled its March 3, 2015 appearance at the last minute for the Cowen and Company 35th Annual Health Care Conference. The Company then cancelled its scheduled appearance at the 27th Annual ROTH Conference on March 10, 2015, also at the last minute.

62. These cancellations fueled rumors that Acadia would be acquired, causing the Company's stock price to surge further 18% to $45.88 per share on March 10, 2015. At that time, the Individual Defendants did not inform the market of the problems with the NDA.

**V.    THE REASONS WHY THE STATEMENTS WERE IMPROPER**

63. The statements set forth in ¶¶ 51-59 were materially false, misleading and incomplete when made, in violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and SEC Rule 10b-5 promulgated thereunder (giving rise to liability in the Securities Class Action). Indeed, in the order issued in the Securities Class Action on September 9, 2016, Judge Moskowitz summarily denied defendants' motion to dismiss, finding, *inter alia*, that the repeated assurances by Acadia's senior management that the NDA remained "on track" for submission by March 31, 2015 were "materially misleading." See September 9, 2016 Order at 11.

64. The true facts, which were known or were recklessly disregarded by the Individual Defendants but concealed from the investing public during the Relevant Period, were as follows:

(a)    The Company was not prepared and not on track to submit its NDA for NUPLAZID by March 31, 2015;

(b)     The Company did not have robust quality assurance systems, documentation and record-keeping systems, commercial-oriented standard operating procedures, and other relevant systems in place to monitor the activities of third-party suppliers and manage materials through the supply chain, and therefore lacked the systems necessary to support the commercial manufacturing and supply of NUPLAZID and approval of the Company's NDA for NUPLAZID; and

(c)     The Company had not yet conducted a mock inspection of its commercial manufacturing and supply systems to determine whether they were sufficient to support approval of the Company's NDA for NUPLAZID.

## VI.    THE TRUTH EMERGES

65.    The Individual Defendants' false and ongoing narrative that the Company would be ready and on track to submit the NDA for NUPLAZID by the end of the first quarter of 2015 finally began to unravel in March 2015.  On March 11, 2015, just two weeks after the Individual Defendants had reported that Acadia would meet the March 31, 2015 timetable, the Company issued a press release announcing another change in the timing of the planned NDA submission.  This time, contrary to their prior assurances, the Individual Defendants announced their plan to submit the NDA **nine to ten months later, in the second half of 2015**.  Defendant Davis stated in the release that "[w]e have concluded that additional time is needed to complete the readiness of our commercial manufacturing systems."  The March 11, 2015 press release stated in part:

> "We have concluded that additional time is needed to complete the readiness of our commercial manufacturing systems," said Steve Davis, Interim Chief Executive Officer of ACADIA. "While we are very disappointed with the change in timing, we believe that this is the prudent course of action to take. We are working expeditiously to ensure that our systems are robust and ready for FDA review and commercial launch. Importantly, we remain confident in the safety

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and efficacy package supporting the NDA of NUPLAZID, which received Breakthrough Therapy designation from the FDA last year."

66.    Later that day, the Individual Defendants caused Acadia to host a conference call, during which Defendant Davis provided further explanation the delay, stating that Acadia "completed in assessment" of its "manufacturing, quality systems and procedures," which is a customary, but important step in preparing for an NDA review and the inspections that are part of that review." Davis's relevant comments during the conference call are as follows:

[Defendant Davis]: In preparation for the submission of the NDA, we completed an assessment of our manufacturing and quality systems and procedures. This is a customary but important step in preparing for an NDA review and the inspections that are part of that review. Based upon this assessment we determined that we needed to do additional work to prepare our systems to support commercial scale manufacturing and supply.

I'm going to pause here and just take a second to provide some context around the system that I am describing. Moving from a clinical stage company to a commercial stage company as we are doing requires building infrastructure to accommodate commercial scale operations. These systems include things such as robust quality assurance systems, documentation and record-keeping systems, commercial oriented standard operating procedures or SOPs, systems to monitor activities of third-party suppliers and simply the management of materials through the supply chain.

Many of these systems exist when you are a clinical stage company but have to be significantly expanded and much more robust for commercial scale production. Establishing the infrastructure I have described requires close coordination between our internal manufacturing resources, external third-party suppliers and the quality assurance functions within each organization. Because these manufacturing and supply systems are subject to inspection as part of the NDA review process, it is important that our systems be robust and ready for FDA review and of course for commercial launch.

To be ready for that review, the systems need to be established, they have to be tested and evaluated and frequently they need to be tested in connection with actual production runs completed by your third-party suppliers. In other words, it is not just a paper exercise; you sometimes need to test them in real production runs.

So this requires coordination of our schedule with the schedules and availability of others and the logistics quite frankly, can be challenging. With that context, the assessment we recently concluded indicates that the network of systems needed to support commercial manufacturing and supply and again importantly, the review of our

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

NUPLAZID NDA, requires further implementation and additional testing, work that was not part of the Company's original plan.

As a result of information from this assessment, we have decided to move back the planned NDA submission of NUPLAZID to the second half of 2015.

68.     Also during the conference call, Defendant Davis addressed the "retirement" of Defendant Hacksell, and Davis' own appointment as interim CEO, as follows:

[Defendant Davis]: . . . Now let me address the corporate release we issued today regarding the change in management. As you are aware, we announced today that Uli Hacksell has retired as Chief Executive Officer and as a member of the Board of Directors effective today. We thank Uli for his many contributions to ACADIA taking the Company from a small start-up to a significant biopharmaceutical company with significant growth potential. Uli's dedication, his tenacity, his deep knowledge of the CNS space and lifelong passion to deliver new drugs that can improve the lives of patients with CNS disorders have benefited ACADIA greatly.

During this transition period, our Board of Directors has appointed me as interim Chief Executive Officer. As many of you on the call are aware, I recently joined ACADIA eight months ago as its Executive Vice President, Chief Financial Officer and Chief Business Officer. For those of you that I haven't connected with as much, by way of background I have an extensive operational experience with over 20 years at the executive level and have worked as CEO and COO at other biopharmaceutical companies. I also have over 20 years of collective experience sitting on the Boards of Directors of public biopharmaceutical companies including three companies in the last year that are at similar stages of commercial preparations as ACADIA.

I have an extensive network in the industry. I have seen these types of issues before and I am fully confident we will solve them. I look forward to working with our senior leadership team to put our full weight and resources behind advancing NUPLAZID towards registration and preparing the drug for its planned launch.

69.     Defendant Davis also fielded questions from investment analysts about the new NDA timetable, including an inquiry from an analyst who commented that Acadia's management had been "confident in the 1Q timetable" just two weeks before.   In response, Davis conceded that "mistakes' and "missteps" were made in preparing the NDA for submission.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

[Analyst]: . . . So I guess just wondering, your 4Q call was two weeks ago and obviously you were confident in the 1Q timeline then. Can you just help us understand what has happened between then and now and how can we be at all confident in the new timeline you guys have given?

[Defendant Davis]: It is a fair question. I will just start by saying that preparing and filing an NDA is a huge amount of work across many functions of the Company and as we got closer to the final submission date and diverse functions of the Company became coordinated, the group of us sitting around this table became aware that we had more work to do to be prepared in the areas that I mentioned. And we collectively decided that the best approach to filing a successful NDA would be to take more time prior to the filing. Ultimately it is a judgment call when to file but we are confident that the right balance is to take some more time to best position the Company for a successful NDA review.

Look, I'm going to be honest. Obviously mistakes were made. The Company should have been better prepared but we have taken decisive steps to address those missteps and I am very confident in the team here.

[Analyst]: Can you remind us again who your third-party manufacturers are?

[Defendant Davis]: We have not disclosed the identity of those companies.

What I can tell you is they are name brand third-party manufacturers, CMOs, that are extensively used in the biopharmaceutical industry and perhaps more importantly used by the major pharmaceutical companies.

[Analysts]: And the particular plants of the third parties that you are using, are they currently all GMP certified and completely basically passed through inspection?

[Defendant Davis]: They are and without talking specifically about individual companies, they have all been inspected by multiple regulatory agencies in the recent past.

[Analyst]: And you mentioned just a breadth of things that are involved in these quality systems and procedures, things like standards, SOPs, raw material, supply chain. Is there one or two particular areas that are the focus of the ongoing activity? I can't imagine that every single one of these would need work.

[Defendant Davis]: No, quite frankly as I mentioned, you do a lot of these things at a clinical stage level and when you go to commercial stage, they frankly need to be more robust, there are some things that you do that are new but most of the things just have to be done at a much more industrial scale. And again speaking quite frankly, the Company didn't start the process early enough to really get those

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

things in place.  We have made very good progress I think in the last few months but this recent assessment we had indicates that we've got more work to do.

We have identified the areas that we think need most work. We have a very clear plan to address them and again in this business, you always worry about the things you don't know and those things can always happen but based upon everything we know today, we are very confident in our projection of being ready to submit in the second half.

\*        \*        \*

[Analyst]:. . . And then just last and this is maybe a bit subjective but management -- occasionally programs do slip in terms of the filing and management changes in conjunction with such timelines may seem appropriate but may to some also seem a bit Draconian. And I wrestle with that word. Can you comment a little more on why they were necessary or specific in this instance?

[Defendant Davis]: Well, let me start by saying Uli has discussed with the Board for some time retiring from the Company. So look, this is in the short term, this is a very painful process for the Company. We don't like missing timelines. In the long run, it has no bearing whatsoever  on the ultimate potential of this drug. Again, I am quite confident that we will resolve these issues and I am very, very confident that as we move forward here, that we will continue to explore the full range of potential that the molecule has.

We really very much appreciate the significant contributions that Uli has made to the Company. He brought the Company from a very small and very challenged company to one that has tremendous promise today. Operationally, we know exactly what we need to do. We are dedicated to doing it and we have a very clear plan and I think a very cohesive management team executing that plan.

70.    Also during the March 31, 2015 conference call, Defendant Davis acknowledged that the Company had hired "additional in-house experts to bolster capabilities," who were already "on board."  Davis' comments indicate that these "in-house experts" had been assisting the Company with its infrastructure and manufacturing systems for quite some time—at least before Defendant Hackell and Mills stated that the Company was "on track" to submit the NDA by March 31, 2015, just two weeks prior.  Davis' relevant statements are as follows:

[Analyst]:   . . . You also mentioned you would be bringing on additional in-house experts to bolster capabilities? I guess are those people already on board or when are you planning to do that?

31
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

[Defendant Davis]: They are on board.

[Analyst]: How long have they been on board?

[Defendant Davis]: As we have moved through the last year, we have continued to build our capabilities and so as we have advanced on a number of fronts, number of infrastructure fronts, we have continued to build out the capabilities and I would say that we are on track with where we need to be and expected to be.

*       *       *

[Analyst]: . . . Just following on to Whitney's questions, the additional, the expert consults, the in-house experts and the management changes that you referred to, is this a function of new people being cycled into existing positions, especially at the management level or will you be bolting on and creating new positions?

[Defendant Davis]: I am not sure I understood the question. Let me answer what I think you asked and if I don't get it exactly right please let me know.

So as we have progressed through the last year, we have continued to grow at a healthy rate. So we have mapped out over a year ago and then we have continued to refine this. The positions that we need, the functions that we need, the resources we need, so we have a very, very detailed plan that we are continuing to execute on in that regard.

I think in terms of changes in management from existing roles, obviously Uli has retired and as I mentioned, he has made great, great contributions to the Company. I think the team that we have here is -- our responsibilities other than mine have all continued on the same track and same plan that we have been on for some period of time.

The buildout of the organization at the further senior level and middle management level is completely on track and going according to plan.

And so I think from that perspective, the overall plan is moving forward as we would have expected. We have made some course corrections here. We have made some course corrections in terms of personnel, realigning responsibilities. One of the things that we have done for instance is we have moved our quality function under our regulatory function. We have a very highly seasoned professional overseeing that area that has deep knowledge in this area so we've made some of those kinds of changes to make certain that we have the very best people executing the plan.

[Analyst]: Got it. Right now, who at the senior level is the ultimate report for manufacturing and CMC? Is that you?

[Defendant Davis]: Yes, at the moment that reports into me. We have an experienced manufacturing person that oversees the manufacturing portion. I mentioned that the quality function is reporting into our head of regulatory and again, this entire system is complemented by a

32

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

very extensive network of consultants that we have worked with for some time and I have coincidentally worked with them at other companies as well. We have also brought in additional resources on that front as well.

[Analyst]: And a couple of questions coming in from clients and then I will stop. Why did Uli have to come off the Board? I mean we know Uli has contributed in an executive capacity but that seems like a strategic shift or disagreement on a fundamental basis.

[Defendant Davis]: Yes, so let me address that. First, I would just say that when a CEO leaves the organization, it is very common for them to also step off of the Board. You mentioned strategic direction and maybe alluded to is there a change in strategic direction. Let me just be very clear, there is no change in strategy at all. Everything that we are focused on today is simply an operational set of issues that will resolve.

So the strategic direction of the Company, our intent to launch this drug independently in the United States, maintaining options to possibly partner outside of the United States or possibly launch ourselves particularly in Europe remain the same. There is no change in strategy or direction of the Company.

71.    Finally, Defendant Davis clarified that the additional delay in the submission of the NDA was not due to any issue with the "quality" of NUPLAZID, but rather because of problems with manufacturing and quality assurance systems:

[Analyst]: And just last confirmatory question, can you just confirm that there was no issue with the actual drug product rather than quality assurance systems or supply?

[Defendant Davis]: There is no issue with the drug product itself. No issue with drug substance, the drug product, the formulation, synthesis. There is no issues on that front at all.

\*        \*        \*

[Analyst]: Thanks for taking the follow-up. Again just another confirmatory question. Can you just confirm or I guess -- other then the manufacturing and quality control side of things, would you have been in a position to file the NDA this month as previously expected?

[Defendant Davis]: Yes.

67.    Following the shocking announcement of the revised timetable for the submission of the NDA, the price of Acadia common stock dropped $9.94 per share to close at $34.82 per share on March 12, 2015, a one-day

33

decline of 22% on volume of 15 million shares.

68.     Since announcing the additional delay of the NDA, Acadia has provided additional information about the delay, revealing that the necessary manufacturing quality assurance protocols and corresponding documentation were not ready and would not be ready for months.  On March 17, 2015, analyst Cowen & Company published a report titled, "Behind the 8 Ball, But Catching Up: Highlights From Meeting With ACAD Mgmt," in which it described its meeting with ACADIA's management.  Notably, based on its discussion with Acadia's management, Cowan & Company reported that the Company was "significantly behind in finalizing its manufacturing quality assurance protocols, having likely started developing the protocols too late in the NDA process."  The report stated in relevant part:

> We met ACAD's mgmt team yesterday to further discuss details of the pimavanserin NDA delay. We understand that non-NDA package in-house quality assurance protocols/documentation are not ready and will not be ready for up to 9 months, (but possibly sooner). We think pima's clinical profile continues to be very positive, and have little to no doubt on its approvability.
>
> *     *     *
>
> We think ACAD is significantly behind in finalizing its manufacturing quality assurance protocols, having likely started developing the protocols too late in the NDA process. We think is especially true as, anecdotally, FDA inspections (both clinical and manufacturing) are now sometimes occurring very early in the NDA review process. Importantly, these protocols are not part of an NDA. ACAD believes the pima NDA is complete, and now only needs to be updated until time of submission. However, failure to have protocols ready for inspections could result in a Refuse-To-File letter or Complete Response Letter, delaying approval.

69.     On March 26, 2015, Cowen & Company published another analyst report titled, "Group Lunch Takeaways: Playing Catch-Up With Quality Assurance," which provided additional commentary about the delay from another meeting with Acadia management.  The report stated in relevant part:

> We hosted a group lunch with ACAD yesterday where overall the major topic of discussion was the outstanding quality assurance issues that ACAD intends to rectify/complete before NDA submission. Most

34

key points discussed were covered in the note detailing our previous note with takeaways from Cowen's meeting with ACAD on March 16th. Deficiencies involve SOPs for various functions, supply chain, training documentation, protocols for product release etc. Some of these issues require test manufacturing runs to evaluate, which require reserving manufacturing suites for test runs, which in turn, force ACAD to schedule around their CMOs schedule (costing time), reserving additional manufacturing line time slots (costing money), or both.

ACAD is reserving the right to start a rolling NDA, but believes initiating one may either trigger or start the clock on an inspection even before all modules (even CMC) are submitted.

*        *        *

The responsibilities previously handled by ACAD's head of quality assurance were recently assumed by the same consulting agency that was retained to assist ACAD in a supportive quality assurance role in Fall 2014. The engagement of this firm shortly preceded the recognition of preliminary deficiencies that resulted in the first NDA delay to 1Q15. ACAD is actively conducting a search for an internal head of quality assurance and will be hiring more members of that department. ACAD is also currently conducting a permanent CEO search, in which the acting CEO Steve Davis is a candidate.

70. On an April 14, 2015, the Individual Defendants caused Acadia to present at the Needham Healthcare Conference, during which Defendant Davis provided further comment on the issues leading to the delay. In addressing the "CMC-related activities" (which as discussed at ¶ 45 were part of the formal requirements for NDA submission), Davis noted that the Company needed to do additional work with respect to "preapproval inspections associated with manufacturing." Davis stated in relevant part:

So Alan has asked if I could elaborate a little bit more on NDA submission, CMC-related activities, etc. I think, as everyone in the room is aware, we pushed the submission back to the second half. We were planning to submit at the end of the first quarter and determine that we have just more work that we need to do to be ready to submit.

We gave a fairly broad range of the second half of the year. That was conscious and intentional, and the reason for that is the work that we need to do really revolves around making certain that we are ready for preapproval inspections. In order to get to that state of readiness, there's a certain amount of work that needs to be done in collaboration with our third-party suppliers, and because we are relying on other people's schedules, it's important -- I felt like it was important to make certain that we had factored in a certain degree of uncertainty regarding just what their schedules will entail.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Just to give the broader context, to get a drug approved you need to do three things, right? One is the NDA which is the primary focus of the drug approval. Our NDA is ready to go, so we can check that box. We could push the button tomorrow and submit the NDA. It's about 700,000 pages, so as you can see it's a very substantial document.

That's not atypical, by the way. The other two buckets that are required to get a drug approved are passing what's referred to as preapproval inspections, and they come in two forms. One is on the clinical side and we've done what most companies do. We did an extensive amount of preparation, getting ourselves ready for those inspections, and we did again what most companies do. We hired former FDA inspectors, had them come in and do a mock inspection and do the same kind of inspection that we expect FDA to do. The results of that were that we are ready to go on the clinical side.

We did the same thing on the third bucket and that is on your preapproval inspections associated with manufacturing. We determined then that we have more work to do and so that's the subject of the work that we're doing now**.** I have said many times, I am not aware of any company that has failed to get their drug approved because they couldn't get a quality assurance system in place that passes a preapproval inspection.

So we will do that. It's a process that we need to get in place. I'm highly confident that we will get that in place. I think we've got the right team. We've got the right plan. It's an extensive plan and a very robust team working on this, and based on everything I know today, I'm confident that we will submit the NDA in the second half.

\*       \*       \*

The remaining bucket that we need to address is getting the quality assurance system in place on the GMP side of the equation. Once we have that in place, which again every company does -- I'm highly confident we will -- the commercial group is ready to go.

71.     Acadia finally submitted the NDA for NUPLAZID on September 3, 2015—**approximately five months after the planned deadline of March 31, 2015**.  Also, that same day, the Company announced the formal appointment of Defendant Davis as CEO and member of the Board.

72.     A few weeks later, on September 29, 2015, Acadia presented at the Ladenburg Thalmann Healthcare Conference, during which Davis responded to an inquiry about "manufacturing issues" that contributed to the delay in the NDA submission.  Davis stated that the Company recognized in **February or March 2015** that it was not prepared to submit the NDA due to problems relating to the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's quality assurance system:

> [Analyst]: . . . I want to lead with a significant focus of investors over the past several quarters, just a manufacturing issue. I know it's been something that's been a focus. How confident are you that you have that buttoned-up completely at this point?

> [Defendant Davis]: . . . I would start by saying, the issue that we've addressed is not a manufacturing issue per se. It's a quality assurance issue. And quite simply, as you move from a clinical stage company into a commercial stage company, there are a number of systems that need to be enhanced and significantly built to make that transition. The quality assurance system is one of them.

> And so, on – the company just didn't start soon enough in building out the Quality Assurance system or making that transition to a commercial-grade QA system on the GMP front. We recognized that in March of this year or February this year, and began the process of building that out. At the time that we made the transition, when I moved into the Interim CEO role, I indicated that we would – we plan to – we were going to do it right. We're going to finish the work there and we plan to submit the NDA in the second half of this year.

73.     On August 6, 2015, the Individual Defendants caused Acadia to file its quarterly report on Form 10-Q for the second quarter of 2015 ("Q2 10-Q"). The Q2 10-Q provided that the Company "licensed worldwide intellectual property rights related to pimavanserin in certain indications to ACADIA Pharmaceuticals GmbH," ACADIA's "wholly-owned Swiss subsidiary," which "will manage the worldwide supply chain of pimavanserin."

74.     The Q2 Form 10-Q also disclosed that on August 3, 2015, Acadia entered into a master manufacturing services agreement and product agreement with Patheon Pharmaceuticals Inc. ("Patheon").  Pursuant to the agreement, Patheon will manufacture and supply NUPLAZID for Acadia's commercial use in the United States, and Acadia will purchase from Patheon a certain percentage of its commercial requirements of NUPLAZID for the United States.  Patheon will manufacture the drug using the active pharmaceutical ingredient ("API") supplied by another third-party manufacturer.  With respect to Acadia's ability to inspect Patheon's facilities, paragraph 7.5 of the agreement provides:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Patheon will give Client reasonable access at agreed times to procedures and documentation relevant to the Product, and to the areas of the Manufacturing Site in which the Products are manufactured, stored, handled, or shipped, to permit Client to verify that the Manufacturing Services are being performed in accordance with the Specifications, cGMPs, Applicable Laws and the Quality Agreement. But, with the exception of "For Cause" Audits, Client will be limited each Year to one cGMP-type audit, lasting no more than […***…] days, and involving no more than […***…] auditors. Client may request additional cGMP-type audits, additional audit days, or the participation of additional auditors subject to payment to Patheon of a fee of $5,000 for each additional audit day and $1,000 per audit day for each additional auditor. The right of access set forth in this Section 7.5 will not include a right to access or inspect Patheon's financial records. In addition, upon the request of any Regulatory Authority having jurisdiction over the manufacture of Products hereunder, the Regulatory Authority will have access to observe, audit and inspect any Manufacturing Site and Patheon's procedures used for the manufacture, release and stability testing, and/or warehousing of Products and to audit those facilities and procedures for compliance with cGMP and/or other regulatory requirements. Patheon specifically agrees to cooperate with any inspection by a Regulatory Authority, whether prior to or after Regulatory Approval of a Product, and to provide Client a copy of any inspection or audit report resulting from the inspection within three Business Days from receiving the report. Client may be present at the Facility for consultation during any such inspection.

75.     Shortly thereafter, on August 21, 2015, ACADIA filed a Form 8-K with the SEC announcing that its Swiss subsidiary entered into an agreement with BASF Pharma (Evionnaz) SA ("BASF"), pursuant to which BASF will manufacture and supply pimavanserin tartrate, the API of NUPLAZID, for the Company's commercial use.

76.     The Company filed the manufacturing agreements with Patheon and BASF as exhibits to its quarterly report on Form 10-Q for the third quarter of 2015.

77.     On September 3, 2015, the Company issued a press release announcing that it had submitted its NDA for NUPLAZID.

78.     On November 2, 2015, the Company issued a press release announcing that the NDA for NUPLAZID was granted Priority Review. As explained in the press release, Priority Review "accelerates the review timeline from 10 months to six months from the date of acceptance of filing."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

79.     Two days later, on November 6, 2015, the Company filed a Form 8-K with the SEC announcing the resignations of Defendant Mills, as Executive Vice President and Chief Medical Officer, and Defendant Kaplan from the Board.   No further information was provided, and both resignations were described as "effective immediately."

## VII.   INSIDER SELLING

80.     Not all Acadia shareholders were harmed by the Individual Defendants' misconduct.  Indeed, while in possession of material, adverse, non-public information, certain of the Individual Defendants took advantage of the artificially inflated prices to sell their shares of Acadia stock during the Relevant Period.   As detailed below, the Insider Selling Defendants sold more than $8.1 million of personally held common stock.

81.     Defendant Hacksell was a member of Acadia's Board, as well as CEO, until his "resignation" on March 11, 2015.   Hacksell was aware of material, non-public information regarding the inaccuracy of the Company's statements, and his own statements, in the Company's press releases and public filings.  While in possession of this adverse insider information, Hacksell sold at least 120,000 personally held shares of Acadia stock at during the Relevant Period at artificially inflated prices, for proceeds of more than $3.85 million.  Hacksell's sales were timed to maximize profits from the Company's then artificially inflated stock price, as follows:  (i) on November 24, 2015, he sold 30,000 shares at approximately $29.28 per share for proceeds of $878,397; (ii) on December 14, 2015, he sold 30,0000 shares at approximately $31.00 per share for proceeds of $929,916; (iii) on January 14, 2015, he sold 30,000 shares at approximately $33.98 per share for proceeds of $1,019,430; on February 17, 2015, he sold 30,000 shares at approximately $34.30 per share for proceeds of $1,020,868.  Notably, for each of these sales, Hacksell exercised his Company

1  stock options and then gifted the shares to his family trust, which in turn sold the

2  shares.  These sales resulted in total proceeds of $3,856,611 in just four months.

3      82.    Defendant Mills was Acadia's Executive Vice President,

4  Development, and Chief Medical Officer until his "resignation" on November 4,

5  2015.  Mills was aware of material, non-public information regarding the

6  inaccuracy of the Company's statements, and his own statements, in the

7  Company's press releases and public filings.  While in possession of this adverse

8  insider information, Mills sold at 25,000 personally held shares of Acadia stock

9  at during the Relevant Period at artificially inflated prices.  Mills' sales were

10  timed to maximize profits from the Company's then artificially inflated stock

11  price, as on November 26, 2014, he sold 25,000 shares at approximately $30.09

12  per share for proceeds of $752,265.  Notably, Mills only sold common stock on

13  two other occasions in 2013 prior to his sale on November 26, 2014.

14      83.    Defendant Michael Borer was a member of the Company's Board.

15  During the Relevant Period, Borer was aware of material, non-public information

16  regarding the inaccuracy of the statements made by Acadia's senior management

17  in the Company's press releases and public filings.  While in possession of this

18  information, Borer sold at almost 43,000 personally held shares of Acadia stock

19  at artificially inflated prices, for proceeds of more than $1.37 million.  Borer's

20  sales were timed to maximize profits from the Company's then artificially

21  inflated stock price, including the following sales: (i) On November 26, 2014,

22  Borer sold 15,000 shares of common stock at approximately $30.05 per share for

23  proceeds of $450,765; (ii) on January 15, 2015, Borer sold 27,973 shares of

24  common stock at approximately $33.02 per share for proceeds of $923,766.

25  These sales resulted in total proceeds of $1,374,531.  The sales were not

26  conducted according to any pre-established pattern as Borer had never sold a

27  single share of Acadia stock prior to the start of the Relevant Period.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

84. Defendant Mary Ann Gray was a member of the Company's Board. During the Relevant Period, Gray was aware of material, non-public information regarding the inaccuracy of the statements made by Acadia's senior management in the Company's press releases and public filings. While in possession of this information, Gray sold at least 16,500 personally held shares of Acadia stock at artificially inflated prices. Gray's sales were timed to maximize profits from the Company's then artificially inflated stock price, including the following sales: (i) On December 15, 2014, Gray sold 12,250 shares of common stock at approximately $31.74 per share for proceeds of $388,815; and (ii) on January 13, 2015, Gray sold 4,250 shares of common stock at approximately $35.00 per share for proceeds of $148,750. These sales resulted in total proceeds of $537,565.

85. Defendant Torsten Rasmussen was a member of the Company's Board. During the Relevant Period, Rasmussen was aware of material, non-public information regarding the inaccuracy of the statements made by Acadia's senior management, in the Company's press releases and public filings. While in possession of this information, Rasmussen sold at least 17,000 personally held shares of Acadia stock at artificially inflated prices, for proceeds of more than $1.1 million. Rasmussen's sales were timed to maximize profits from the Company's then artificially inflated stock price, including the following sales: (i) on January 13, 2015, Rasmussen sold 8,500 shares of common stock at approximately $35.00 per share for proceeds of $416,676.19; and (ii) on February 7, 2015, Rasmussen sold 8,500 shares of common stock at approximately $35.04 per share for proceeds of $695,544.07. These sales resulted in total proceeds of $1,112,220.26. The sales were not conducted according to any pre-established pattern as Rasmussen had only sold shares of Acadia stock on just one other occasion prior to the start of the Relevant Period.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

86.    Defendant Laura Brege is a member of the Company's Board. During the Relevant Period, Brege was aware of material, non-public information regarding the inaccuracy of the statements made by Acadia's senior management in the Company's press releases and public filings.   On February 11, 2015, while in possession of this information, Brege sold at least 10,000 personally held shares of Acadia stock at approximately $33.63, for proceeds of $336,349.  Brege's sales were timed to maximize profits from the Company's then artificially inflated stock price.

87.    Defendant Wells was a member of the Company's Board.  During the Relevant Period, Wells was aware of material, non-public information regarding the inaccuracy of the statements made by Acadia's senior management in the Company's press releases and public filings.  On November 21, 2014, while in possession of this information, Wells sold at least 5,810 personally held shares of Acadia stock at approximately $29.00, for proceeds of $168,490. Wells's sales were timed to maximize profits from the Company's then artificially inflated stock price.

88.    The foregoing insider sales, which resulted in total proceeds of more than $8.1 million, are summarized in the following chart.  These insider sales were executed under highly suspicious circumstances and occurred while the Company's stock price was artificially inflated due to the misrepresentations and omissions alleged herein.

| Insider | Date | Shares | Price | Proceeds |
|---------|------|--------|-------|----------|
| Brege | February 11, 2015 | 10,000 | $33.63 | $336,349.00 |
| | **TOTAL** | **10,000** | | **$336,349,00** |
| Hacksell | November 24, 2014 | 30,000 | $29.28 | $878,397.00 |
| | December 15, 2014 | 30,000 | $31.00 | $929,916.00 |
| | January 14, 2015 | 30,000 | $33.98 | $1,019,430.00 |
| | February 17, 2015 | 30,000 | $34.30 | $1,028,868.00 |
| | **TOTAL** | **120,000** | | **$3,856,611.00** |
| Mills | November 26, 2014 | 25,000 | $30.09 | $752,265.00 |
| | **TOTAL** | **25,000** | | **$752,265.00** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Rasmussen | January 13, 2015 | 11,905 | $35.00 | $416,676.19 |
| | February 17, 2015 | 19,847 | $35.05 | $695,544.07 |
| | **TOTAL** | **31,752** | | **$1,112,220.26** |
| Borer | November 26, 2014 | 15,000 | $30.05 | $450,765.00 |
| | January 15, 2015 | 27,973 | $33.02 | $923,766.37 |
| | **TOTAL** | **42,973** | | **$1,374,531.37** |
| Gray | December 15, 2014 | 12,250 | $31.74 | $388,815.00 |
| | January 13, 2015 | 4,250 | $35.00 | $148,750.00 |
| | **TOTAL** | **16,500** | | **$537,565.00** |
| Wells | November 21, 2014 | 5,810 | $29.00 | $168,490.00 |
| | **TOTAL** | **5,810** | | **$168,490.00** |
| **TOTAL INSIDER SALES** | | | | **$8,138,031.63** |

## VIII.  DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.  Fiduciary Duties

89.     By reason of their positions as officers, directors, and/or fiduciaries of Acadia, and because of their ability to control the business and corporate affairs of Acadia, the Individual Defendants owed and continue to owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Acadia in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Acadia and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

90.     Each director and officer of the Company owes to Acadia and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

91.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business

prospects so that the market price of the Company's stock would be based on truthful and accurate information.

## B.     Audit Committee Duties

92.     In addition to the forgoing fiduciary duties, the members of Acadia's Audit Committee owed specific duties to the Company under the Audit Committee's Amended and Restated Charter (the "Audit Committee Charter) to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

93.     According to the Audit Committee Charter, "[t]he primary purpose of the Audit Committee . . . shall be to act on behalf of the Company's Board in fulfilling the Board's oversight responsibilities with respect to: (i) the Company's corporate accounting, financial reporting processes, systems of internal accounting and financial controls, and audits of financial statements; (ii) the quality and integrity of the Company's financial statements and reports; and (iii) the qualifications, independence and performance of any registered public accounting firm engaged for the purpose of preparing or issuing an audit report (the "Auditors") or performing other audit, review or attest services for the Company."

94.     With respect to their duties concerning "internal controls and risk management," the Audit Committee Defendants were responsible for the following, *inter alia*:

> **Internal Control Over Financial Reporting.** Discuss with management and the Auditors the scope, adequacy and effectiveness of the Company's internal control over financial reporting.

> **Financial Risk Assessment and Management**. Review and discuss with management the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures, including reviewing and/or implementing any guidelines and policies with respect to financial risk assessment and management adopted by the Company.

95.     With respect to their duties concerning financial reporting, the Audit Committee Defendants were responsible for the following, *inter alia*:

***Accounting Principles and Policies.*** Review and discuss with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices; alternative accounting policies available under GAAP that the Auditors have discussed with management, the ramifications of the use of such alternatives and the treatment preferred by the Auditors; the potential impact on the financial statements of regulatory and accounting initiatives; and any other significant reporting issues and judgments.

***Annual Audit Results.*** Discuss with management and the Auditors the results of the annual audit, including, but not limited to, the Auditors' assessment of the quality of accounting principles, the reasonableness of significant judgments and estimates, any audit adjustments proposed by the Auditors and management's acceptance or rejection of those adjustments, the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors under the standards of the Public Company Accounting Oversight Board (United States).

***Management's Discussion and Analysis.*** Review and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the Securities and Exchange Commission (the ***"SEC"***).

***Audited Financial Statements.*** Upon completion of the annual audit, (i) review the Company's annual financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC and (ii) recommend whether or not such financial statements should be so included.

***Quarterly Results.*** Prior to public disclosure of quarterly financial information, review and discuss with management and the Auditors the results of the Auditors' review of the Company's quarterly financial statements proposed to be included in the Company's Quarterly Report on Form 10-Q to be filed with the SEC, or included in the Company's quarterly earnings release, and any other matters required to be communicated to the Committee by the Auditors under the standards of the Public Company Accounting Oversight Board (United States).

***Press Releases.*** Review and discuss with management and the Auditors, as appropriate, earnings press releases, as well as financial information and earnings guidance, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The chairperson of the Committee may represent the entire Committee for purposes of this discussion.

96.     Upon information and belief, throughout the Relevant Period, Acadia maintained an Audit Committee Charter (or charters) that was (or were) materially and substantially the same in substance as the Company's current Charter described herein.

### C.      Duties Pursuant to the Company's Code of Business Conduct and Ethics

97.     Additionally, the Individual Defendants, as officers and/or directors of Acadia, are bound by the Company's Code of Business Conduct and Ethics (the "Code").   The Code states that Acadia is "committed to maintaining the highest standards of business conduct and ethics" and to that end, "every employee, officer and director [is expected] to read and understand this Code and its application to the performance of his or her responsibilities with the Company."   The Code further provides that "[v]iolations of this Code will not be tolerated."

98.     Specifically, with respect "Honest and Ethical Conduct," the Code provides in relevant part:

> It is the policy of the Company to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

99.     Specifically, with respect to "Legal Compliance," the Code provides in relevant part:

> Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility.

*       *       *

46

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties. You should be aware that conduct and records, including e-mails, are subject to internal and external audits, and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

100.    Specifically, with respect to "Insider Trading," the Codes provides in relevant part:

> Employees who have access to confidential or "inside" information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about the Company or about companies with which we do business is considered confidential information. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical but also illegal. Employees must exercise the utmost care when handling material inside information and must adhere to the Company's Policy Against Trading on the Basis of Inside Information.

101.    Specifically, with respect to "Conflicts of Interest," the Code provides in relevant part:

> We respect the rights of our employees to manage their personal affairs and investments and do not wish to impinge on their personal lives. At the same time, employees should avoid conflicts of interest that occur when their personal interests may interfere in any way with the performance of their duties or the best interests of the Company. A conflicting personal interest could result from an expectation of personal gain now or in the future or from a need to satisfy a prior or concurrent personal obligation. We expect our employees to be free from influences that conflict with the best interests of the Company or might deprive the Company of their undivided loyalty in business dealings. Even the appearance of a conflict of interest where none actually exists can be damaging and should be avoided.

102.    Specifically, with respect to the "Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting," the Code provides in relevant part:

> The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or

47

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees, stockholders and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

\*       \*       \*

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the Securities and Exchange Commission (the "SEC"). Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures.  In addition:

- no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with our Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

103.   Upon information and belief, the Company maintained a version of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Board as those set forth above.

48

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**D.     Control, Access and Authority**

104.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Acadia, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Acadia.

105.   Because of their advisory, executive, managerial, and directorial positions with Acadia, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Acadia.

106.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Acadia, and was at all times acting within the course and scope of such agency.

**E.     Reasonable and Prudent Supervision**

107.   To discharge their duties, the officers and directors of Acadia were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.   By virtue of such duties, the officers and directors of Acadia were required to, among other things:

(a)     refrain   from   acting   upon   material   inside   corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority   and   disseminating   truthful   and   accurate   statements   to   the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like   manner   so   as   to   make   it   possible   to   provide   the   highest   quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

49

(d)     properly and accurately guide shareholders and analysts as to the true financial condition and business prospects of the Company at any given time, including making accurate statements about the Company's financial condition and business prospects;

(e)     remain informed as to how Acadia conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that Acadia was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## IX.   BREACHES OF DUTIES

108.   Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Acadia and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Acadia, as well as in the use and preservation of its property and assets.

109.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Acadia, the absence of good faith on their part, and a reckless disregard for their duties to Acadia and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Acadia.

110.   The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make false and/or misleading statements and/or omissions of material fact that misled shareholders into believing that the Company was on track to submit the

50

1  NDA for NUPLAZID, its most commercially-promising drug candidate, with the

2  FDA by the deadline of March 31, 2015.

3      111.  Due to the Individual Defendants' illegal actions and course of

4  conduct, the Company is now the subject of the Securities Class Action that

5  alleges violations of the federal securities laws.  As a result, Acadia has

6  expended, and will continue to expend, significant sums of money to rectify the

7  Individual Defendants' wrongdoing.

8  **X.  CONSPIRACY, AIDING AND ABETTING,**
   **AND CONCERTED ACTION**

9

10      112.  In committing the wrongful acts alleged herein, the Individual

11  Defendants have pursued, or joined in the pursuit of, a common course of

12  conduct, and have acted in concert with and conspired with one another in

13  furtherance of their wrongdoing.  The Individual Defendants further aided and

14  abetted and/or assisted each other in breaching their respective duties.

15      113.  During all times relevant hereto, the Individual Defendants

16  collectively and individually initiated a course of conduct that was designed to

17  mislead shareholders into believing that the Company's positive statements about

18  its financial performance and outlook during the Relevant Period were accurate

19  when made.  In furtherance of this plan, conspiracy, and course of conduct, the

20  Individual Defendants collectively and individually took the actions set forth

21  herein.

22      114.  The purpose and effect of the Individual Defendants' conspiracy,

23  common enterprise, and/or common course of conduct was, among other things,

24  to: (a) disguise the Individual Defendants' violations of law, including breaches

25  of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the

26  Company's financial performance, business prospects, and lack, and/or deficient

27  internal controls.

28

115.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

116.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## XI.   DAMAGES TO ACADIA

117.   As a result of the Individual Defendants' wrongful conduct, Acadia disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Acadia's credibility.   Acadia has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

118.   As a direct and proximate result of the Individual Defendants' actions as alleged above, Acadia's market capitalization has been substantially damaged, losing hundreds of millions of dollars in value as a result of the conduct described herein.

119.  Further, as a direct and proximate result of the Individual Defendants' conduct, Acadia has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

1         (a)   costs incurred from investigating and defending Acadia and

2 certain officers in the pending Securities Class Action, plus potentially

3 millions of dollars in settlement, or to satisfy an adverse judgment;

4         (b)   costs incurred from compensation and benefits paid to the

5 Individual Defendants, whose compensation was based at least in part on

6 Acadia's artificially-inflated stock price; and

7         (c)   costs incurred from the loss of the Company's customers'

8 confidence in Acadia's products.

9    120.  Moreover, these actions have irreparably damaged Acadia's

10 corporate image and goodwill. For at least the foreseeable future, Acadia will

11 suffer from what is known as the "liar's discount," a term applied to the stocks of

12 companies who have been implicated in illegal behavior and have misled the

13 investing public, such that Acadia's ability to raise equity capital or debt on

14 favorable terms in the future is now impaired.

15         **XII.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

16    121.  Plaintiff brings this action derivatively in the right and for the

17 benefit of Acadia to redress injuries suffered, and to be suffered, by Acadia as a

18 direct result of the Individual Defendants' breaches of fiduciary duties, unjust

19 enrichment, as well as the aiding and abetting thereof, by the Individual

20 Defendants, and further as a direct result of the Insider Selling Defendants'

21 insider selling and misappropriation of information.

22    122.  Plaintiff Savini was a shareholder of Acadia common stock during

23 the Relevant Period, has been so continuously since, and is currently an Acadia

24 shareholder.

25    123.  Plaintiff will adequately and fairly represent the interests of Acadia

26 in enforcing and prosecuting its rights.

27    124.  Plaintiff did not make a pre-suit demand on the Board to pursue this

28 action, because such a demand would have been a futile and wasteful act as to a

majority of the Board, as discussed below.

125.  At the start of the Relevant Period and through March 11, 2015, when the truth of the Individual Defendants' false and misleading statements concerning the timing of Acadia's submission of the NUPLAZID NDA began to be revealed, Acadia's Board was comprised of nine members.  The members of the Board during that period were Defendants Iversen (then-Chairman of the Board), Biggar, Borer, Brege, Gray, Hacksell, Kaplan, Rasmussen, and Wells.

126.  On March 20, 2015, Daniel Soland ("Soland") was elected to fill the Board vacancy, left by the abrupt "resignation" of Defendant Hacksell.

127.  In addition to Hacksell, there were a number of other departures from the Board, either by resignation or declination of reelection.  Defendants Kaplan, Rasmussen, Borer and Gray resigned from the Board on November 6, 2015, December 11, 2015, February 28, 2016, and April 27, 2016, respectively. Also on April 27, 2016, Defendants Iversen and Wells declined to stand for Board reelection.

128.  As of the 2016 Annual Meeting of Acadia Shareholders, held on June 10, 2016, the Board was reduced to seven members.  The current members of the Board, as of the filing of this complaint, are Defendant Biggar (Chairman of the Board since June 2016), Defendant Brege, Defendant Davis, Julian C. Baker, who was appointed in December 2015, Jim Daly, who was appointed in January 2016, Edmund P. Harrigan, who was appointed in November 2015, and Soland, who, as noted, filled the vacancy left by Hacksell in March 2015.  Baker, Daly, Harrigan, and Soland are not named as Defendants herein.

129.  A pre-demand on Acadia's Board is futile and therefore excused because a reasonable doubt exists as to the Board's ability to consider the demand impartially.  As discussed below, a majority of the current members of the Board are not disinterested and independent with respect to the acts and omissions alleged herein.  Notably, all of the current members of the Board are

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

affiliated with Bakers Brothers, the investment advisor and hedge fund operated by Defendant Biggar and Director Baker.  This affiliation, as explained below, raises a direct conflict of interest that prevents all of the directors from acting objectively and disinterestedly in considering whether to bring the claims asserted herein.

## A.    Demand is Futile as Defendant Davis

130.   Demand is futile as to Defendant Davis, as the Company admits Davis does not meet the standards for director independence, given his current role as Acadia's President and CEO.  Davis is also interested, and therefore not independent or disinterested, because he has financially benefitted from his own wrongdoing and wrongdoing of other Individual Defendants, and because his livelihood continues to depend on compensation from Acadia.  For example, in 2014, at a time when he was making and causing Acadia to make material misstatements concerning the timing of the submission of the NDA for NUPLAZID, Davis received approximately $5.2 million in total compensation from Acadia, including salary, stock awards, option awards, non-equity incentive plan compensation, and other compensation.  After being appointed CEO in March 2015, Davis' total compensation significantly increased to more than $12.1 million.

131.   Demand is also futile as to Davis because it is not possible for him to impartially demand that the Company bring the claims asserted herein.  Davis is a named defendant in the Securities Class Action, in which Judge Moskowitz held that the federal securities fraud allegations could proceed against both Acadia and members of its senior management, including Davis.  Davis directly participated in making many of the statements alleged to be false and misleading and is alleged to have acted with scienter.  If Davis is found liable in the Securities Action, then the Company will be liable for securities fraud under Section 20A of the Securities Exchange Act of 1934 and under theories of

55

respondeat superior.

132.   Notably, in the Securities Class Action, Judge Moskowitz singled out Davis, as well as Defendants Hacksell and Mills, in the order denying defendants' motion to dismiss, issued on September 9, 2016 (the "September 9, 2016 Order").   Judge Moskowitz held that Acadia's senior management made "multiple assurances" that the Company was "on track" to submit the NDA by March 31, 2015.   Among these assurances was the December 2, 2016 statement by Davis, in his previous role as CFO, that with respect to the NDA "***what we've guided in the first quarter of 2015, and we remain on track for that***."

133.   The court in its September 9, 2016 Order found that the "on track" statements made by Davis, Hacksell, and Mills were materially false, and that the factual allegations gave rise to a strong inference of scienter, such that "it would be incredible to conclude the CEO [Hacksell], CFO [Davis], and Chief Medical Officer [Mills] of Acadia were not aware of the information at issues that made their "on track" representations misleading."   Also, with respect to scienter, the court found that Davis had "access" to the adverse information at issue, noting that '[o]n March 11, 2015, the day Davis was appointed interim CEO, he stated that he was "ultimate report for manufacturing and CMC."

134.   Judge Moskowitz also recognized that it was Davis who, upon the resignation of Hacksell as CEO on March 11, 2015, broke the news that Acadia would not be able to submit the NDA by March 31, 2015, as previously represented, because the Company needed to do additional work on the manufacturing and quality assurance systems to ensure their compliance with CGMP regulations.

135.   Moreover, liability in the Securities Class Action raises the risk that Davis could be barred by the SEC from serving as an officer or director at any publicly-traded company, thus endangering Davis's livelihood.

136.   Demand is also futile as to Davis due to his extensive business, professional and social ties with Defendant Biggar.  Prior to his role at Acadia, Davis previously served in numerous executive roles at Neurogen, including as the company's CEO, Executive Vice President, and Chief Business Officer. Defendant Biggar is currently a principal of Baker Brothers Investments ("Baker Brothers"), a hedge fund that purportedly focuses on long-term investments in life-sciences companies.  Baker Brothers was founded and is managed by another current member of Acadia's Board, Julian Baker.  Baker Brothers was a principal investor in Neurogen, as it was previously involved in a $100 million private placement purchase of Neurogen stock.  Accordingly, Davis' role as a senior officer of Neurogen, and Baker Brothers' ownership stake in Neurogen, give rise to an inherent and direct conflict which renders Davis unable to objectively and disinterestedly consider bringing the claims set forth herein against Biggar, who is a principal of Baker Brothers.

137.   Based on the foregoing grounds alone, demand would be futile as to Davis.

**B.    Demand Is Excused as to Defendants Biggar and Brege Because They Also Face a Substantial Likelihood of Liability**

138.   In addition to Defendant Davis, Defendants Biggar and Brege also face a substantial likelihood of liability for their individual conduct.  As members of the Board throughout the Relevant Period, these Directors had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true.  By authorizing the false financial statements and public statements alleged herein which were made beginning in November 2015, by signing the annual reports on Forms 10-K filed with the SEC during the Relevant Period, and by failing to correct other statements which Defendants Hacksell, Davis, Mills, and other officers made during such time, these Directors were active participants in breaches of duties of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

good faith, candor, and loyalty, and have subjected the Company to a lawsuit claiming violations of the federal securities laws.  A director's breach of the duty of candor is not entitled to protection under the business judgment rule.  As a result, any demand upon Defendants Biggar and Brege to bring suit against themselves, or against Hacksell, Davis, or Mills, in their roles as officers of the Company would be a useless and futile act.

139.   Notably, during the Relevant Period, Biggar, and Brege, as well as Davis, were particularly focused on the timing of the Company's submission of the NDA for NUPLAZID, and as such, they possessed material, adverse information that the representations that the Company was "on track" to submit the NDA by March 31, 2015 were false and misleading.  As held by Judge Moskowitz in the September 19, 2016 Order, NUPLAZID was "Acadia's most advanced product candidate" that "was critical to the success of the company."  The court also recognized that "the implementation of manufacturing and quality assurance systems was an important component of the NDA process" and honed in on the fact that "Acadia was a relatively small company—97 employees as of December 31, 2015."  These facts raise the strong and compelling conclusion that the Company's officers and directors, particularly Defendants Biggar, Brege, and Davis, knew that due to problems concerning the manufacturing and quality assurance systems for NUPLAZID, the Company would not be able to meet the March 31, 2015 submission deadline.

140.   Moreover, Defendants Biggar and Brege owed duties to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal auditing, risk, and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and care.  Instead, they knowingly and/or with reckless disregard reviewed and authorized the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

141. Defendants Biggar and Brege also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors. The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company were improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

142. Defendants Biggar's and Brege's conduct in issuing or authorizing false and misleading statements throughout the Relevant Period, failing to timely correct such statements, failing to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failing to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties for which the they face a substantial likelihood of liability. If Biggar and Brege were to bring a suit on behalf of Acadia to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile.

### C. Demand is Futile as to Defendant Biggar and Director Baker for Additional Reasons

143. Defendant Biggar, who currently serves as Chairman of the Board, is also a principal of Baker Brothers, an investment advisor and hedge fund that purportedly focuses on long-term investments in life-sciences companies. Baker

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Brothers was founded and managed by another current member of Acadia's Board, Julian Baker. Baker Brothers began investing in Acadia in March 2014 and is currently the largest single investor in the Company by far, as it presently owns 21.6% of the Company's outstanding shares.

144. As discussed herein, Baker Brothers also made substantial investments in Neurogen Corporation, ViroPharma, Incyte Corporation, Portola Pharmaceuticals, and Dynavax Technologies—public companies in which other Acadia Board members currently serve, or have served as directors or senior executives. For example, Defendant Davis previously served in various executive roles at Neurogen, including as the company's CEO, Executive Vice President, and Chief Business Officer. Baker Brothers was a principal investor in Neurogen, having participated in a $100 million private placement purchase of Neurogen stock.

145. Additionally, Defendant Brege also currently sits on the boards of Portola and Dynavax—companies in which Baker Brothers have substantially invested.

146. Demand is therefore futile as to Defendant Biggar and Baker, due to their significant business, professional, and social ties with **each other**, as principals of Baker Brothers. The relationship between Defendant Biggar and Baker creates an inherent and direct conflict which renders Baker unable to objectively and disinterestedly consider bringing the claims set forth herein against Defendant Biggar.

147. Demand is also futile as to Defendant Biggar and Baker, due to their significant business, professional, and social ties with Defendant Davis, established through their respective involvement and investment in Neurogen, which give rise to a conflict rendering them unable to objectively and disinterestedly consider bringing the claims set forth herein against Davis.

148.  Likewise, demand is futile as to Defendants Biggar and Baker, due to their significant business, professional and social ties with Defendant Brege, established through their respective involvement and investment in Portola and Dynavax (companies in which Baker Brothers significantly invested), which give rise to a conflict rendering them unable to objectively and disinterestedly consider bringing the claims set forth herein against Brege.

149.  Moreover, Defendants Biggar and Baker both acted under a direct conflict of interest as current principals of Baker Brothers, because the advancement of one company's interest meant compromising their fiduciary obligations to the other company, and vice versa.  Based on these conflicting relationships, both Biggar and Baker have demonstrated that they are not qualified to act in a fiduciary capacity for Acadia with respect to the asserting claims set forth herein.

**D.  Demand is Futile as to Defendant Brege for Additional Reasons**

150.  Demand is futile as to Defendant Brege for a number of other reasons.  Brege, who currently serves on the Board, was also a member of the Audit Committee during the Relevant Period.  As set forth in the Audit Committee Charter, Brege and other Audit Committee Defendants were responsible for, among other things, reviewing and ensuring the accuracy of the Company's quarterly and annual financial statements and earnings press releases, overseeing the Company's internal controls over financial reporting, and discharging their other duties described herein.

151.  Despite these duties, Brege and the other Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading financial statements, SEC filings, earnings press releases, and earnings guidance, as well as communications with analysts and investors.  Brege and the other Audit Committee Defendants failed in their

61
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

specific duties to ensure that the Company's internal controls over financial reporting were sufficient, and that statements made by the Company regarding its financial condition and business prospects were accurate.

152.  In light of their duties and obligations under the Audit Committee Charter to "review and discuss" with management "significant issues" relating to the Company's financial statements and press releases (such as the timetable for the NDA submission for NUPLAZID, its most promising drug candidate), Brege and the other Audit Committee Defendants had actual knowledge that the representations and statements made on behalf of Acadia, alleged herein, were false and misleading and violated federal and state laws.   Knowing and/or reckless conduct by a director constitutes bad faith and is not entitled to the protection of the business judgment rule.   Accordingly, Brege and the other Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.   Any demand upon Defendant Brege is therefore futile.

153.  Demand is also futile as to Defendant Brege because, as alleged herein, Brege engaged in insider trading activity at a time when she knew of adverse, material, non-public information about the Company's financial outlook that was not being disclosed to the shareholders.

154.  On the basis of this non-public information, Defendant Brege timed her sale of Acadia common stock to maximize profit from the Company's then artificially inflated stock price.

155.  As a result of these illicit insider sales, Defendant Brege received substantial and direct financial benefits not shared with Acadia shareholders, and is therefore directly interested in a demand.  Furthermore, Brege is interested in a pre-suit demand because she faces a substantial likelihood of liability for the breaches of fiduciary duties of loyalty and good faith based on the challenged insider sales, as alleged herein.  As such, demand upon Defendant Brege is futile.

156.  In addition, demand is futile as to Defendant Brege due to her significant business, professional, and social ties with Defendant Biggar.  As noted, Brege also currently sits on the boards of Portola and Dynavax—companies in which Baker Brothers have made significant investments.  Brege's role as a current director at Portola and Dynavax, and Baker Brothers' investments in both companies, give rise to an inherent and direct conflict which renders Brege unable to objectively and disinterestedly consider bringing the claims set forth herein against Defendant Biggar, who is a principal of Baker Brothers.

**E.    Demand is Futile as to Current Directors Soland, Daly and Harrigan for Additional Reasons**

157.  Demand is also futile as to Current Directors Soland, Daly, and Harrigan, due to their significant business, professional, and social ties with certain of the Individual Defendants, which give rise to serious and direct conflicts of interests.

158.  Director Soland previously served as Senior Vice President and Chief Operating Officer of pharmaceutical company ViroPharma, starting in 2008 until its acquisition in 2014 by Shire Plc for approximately $50 billion. Prior to the acquisition, Baker Brothers, the hedge fund run by Defendant Biggar and Director Baker, owned more than 4.3 million shares of ViroPharma, or around 6.6% of the outstanding common stock of that Company.  Soland's role as a senior officer of ViroPharma, and Baker Brothers' ownership stake in ViroPharma, give rise to an inherent and direct conflict, which renders Soland unable to objectively and disinterestedly consider bringing the claims set forth herein against Defendant Biggar, who is a principal of Baker Brothers.

159.  Likewise, Director Daly previously served as Executive Vice President and Chief Commercial Officer at pharmaceutical company Incyte Corporation from 2012 to 2015.  Baker Brothers was a major investor in Incyte,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

as the hedge fund owned more than 23.6 million shares of Incyte, or 12.6% of the outstanding common stock of that company, as of May 2016.  Moreover, Director Baker currently serves on the board of Incyte.  Daly's role as a senior officer of Incyte, and Baker Brothers' ownership stake in Incyte, give rise to an inherent and direct conflict which renders Daly unable to objectively and disinterestedly consider bringing the claims set forth herein against Defendant Biggar, who is a principal of Baker Brothers.

160.   In addition, Director Harrigan previously served as Executive Vice President and Chief Development Officer of pharmaceutical company Neurogen, starting in 2002.   Around the same time, Defendant Davis was Neurogen's Senior Vice President and Chief Business Officer, and then later, was elevated to the position of CEO of the company.  Notably, Baker Brothers was a substantial investor in Neurogen, as the hedge fund was previously involved in a $100 million private placement purchase of Neurogen stock.

161.   Accordingly, Harrigan's role as a former senior officer of Neurogen gives rise to an inherent and direct conflict which renders Harrigan unable to objectively and disinterestedly consider bringing the claims set forth herein against Defendant Davis (who also was a former senior executive officer at Neurogen) and Defendant Biggar (who is a principal in Baker Brothers which substantially invested in Neurogen).

**F.     Demand is Futile as to Defendants Biggar, Brege, and Davis for Additional Reasons**

162.   As particularized herein, to properly prosecute this lawsuit, Defendants Biggar, Brege, and Davis would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to tens of millions of dollars in civil liability and/or sanctions.  This they will not do.  Thus, demand on those Directors is futile, and therefore, excused.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

163.   Furthermore, demand on Biggar, Brege, and Davis is futile because, when given an opportunity to undertake action to correct the violations of the federal securities law by Acadia, they did nothing and merely continued to falsely state in SEC filings that Acadia was in full compliance with such laws and regulations.

164.   Demand is also futile with respect to Biggar, Brege, and Davis because, during the Relevant Period, those Directors received and continue to receive annual retainers, in addition to option awards, purely for being Board members.  The total compensation to these Directors, in the form of retainers, fees, stock awards, and other compensation for 2014 and 2015 was as follows:

| **Director** | **2014** | **2015** |
|---|---|---|
| Stephen Biggar | $247,215 | $394,279 |
| Laura A. Brege | $249,215 | $396,279 |
| Stephen R. Davis | $5,208,923 | $12,133,066 |

165.   These retainers, which are akin to salaries, provide a substantial stipend to these Directors, who depend on it for their personal livelihood. Accordingly, Biggar, Brege, and Davis have benefitted, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.   Thus, demand on Biggar, Brege, and Davis is futile, and therefore, excused.

166.   Moreover, Biggar, Brege, and Davis are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this complaint by directors' and officers' ("D&O") liability insurance which they caused the Company to purchase for their protection with corporate funds,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    *i.e.*, monies belonging to the shareholders of Acadia.   However, the D&O

2    liability insurance policies covering Biggar, Brege, and Davis in this case are

3    likely to contain provisions that eliminate coverage for any action brought

4    directly by Acadia against these Defendants, known as the "insured versus

5    insured exclusion."   As a result, if Biggar, Brege, and Davis were to sue

6    themselves or certain of the officers of Acadia, there would be no D&O

7    insurance protection and, thus, they will not bring such a suit.   On the other hand,

8    if the suit is brought derivatively, as this action is brought, such insurance

9    coverage exists and will provide a basis for the Company to effectuate a

10   recovery.   Thus, demand on Biggar, Brege, and Davis is futile, and therefore,

11   excused.

12            **F.    Demand is Futile as to the Current Directors for Additional
                      Reasons**

13

14       167.   None of the Current Directors can impartially consider whether to

15   assert these claims against Defendant Davis because, if the Company pressed

16   forward with its rights of action in this action, then these efforts would undercut

17   or compromise the Company's defense of the Securities Class Action.   The

18   Current Defendants' inability to act with independence and with disinterest is

19   highlighted by the fact that Defendant Hacksell, despite his involvement in the

20   misconduct alleged herein and his subsequent "resignation" in March 2015,

21   continued to be employed as consultant with the Company, until finally leaving

22   in September 2016.   The Current Defendants' failure to be disinterested and their

23   lack of independence are also demonstrated by their elevation of Defendant

24   Davis to the position of CEO and appointment to the Board, despite Davis's

25   involvement in the misconduct alleged herein.

26       168.   Moreover, demand is futile as to all Current Directors because their

27   extensive business, professional, and social ties with the Individual Defendants

28   render them unable to act disinterested and independent with respect to the acts

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and omissions alleged herein. Indeed, under the factual circumstances described herein, Biggar, Brege, and Davis are far more interested in protecting themselves than they are in protecting Acadia by prosecuting this action, while Baker, Daly, Harrigan, and Solund are far more interested in protecting their valuable business ties with Biggar, Brege, and Davis, as well as the business interests of Baker Brothers, than Acadia's interests. Therefore, demand on Acadia and its Board is futile and is excused.

169. In addition, Plaintiff has not made any demand on shareholders of Acadia to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Acadia is a publicly traded company with thousands of shareholders of record;

(b)    Making a demand on such a large number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Acadia shareholders;

(c)    Making a demand on all shareholders would force Plaintiff to incur excessive expense and obstacles, assuming all shareholders could even be individually identified with any degree of certainty; and

(d)    The Company has been directly and substantially injured by reason of the Individual Defendants' breaches of their fiduciary duties to Acadia. Plaintiff, as shareholder of Acadia, seeks damages and other relief on behalf of the Company in an amount to be proven at trial.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES

170. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

171.   The Individual Defendants owed and owe Acadia fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Acadia the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

172.   The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

173.   The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

174.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Acadia has sustained significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

175.   Plaintiff, on behalf of Acadia, has no adequate remedy at law.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

176.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Acadia.

178.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Acadia.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

179.   Further, the Insider Selling Defendants sold Acadia common stock while in possession of material, adverse non-public information that artificially inflated the price of Acadia stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

180.   Plaintiff, as shareholder and representative of Acadia, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

181.   Plaintiff, on behalf of Acadia, has no adequate remedy at law.

## COUNT III

### AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

182.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

183.   The wrongful conduct alleged regarding the issuance of false and misleading statements, was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

184.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

185.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

186.   Plaintiff, on behalf of Acadia, has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**COUNT IV**

**AGAINST THE INSIDER SELLING DEFENDANTS FOR BREACH OF
FIDUCIARY DUTY FOR INSIDER SELLING AND
MISAPPROPRIATION OF INFORMATION**

187.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

188.   At the time the Insider Selling Defendants unloaded Acadia shares, they knew the information described above, and sold Acadia stock on the basis of such information.

189.   The information described in particularity above was proprietary non-public information concerning the Company's financial condition and business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Acadia stock.

190.   The Insider Selling Defendants' stock sales while in possession and control of this material adverse, non-public information constituted a breach of their fiduciary duty of loyalty and good faith and/or an unlawful misappropriation of Company information.

191.   Since the use of the Company's proprietary information for their own gain constitutes a breach of fiduciary duties and/or unlawful misappropriation of Company information, the Company is entitled to the imposition of a constructive trust on any profits they obtained thereby.

192.   Plaintiff, on behalf of Acadia, has no adequate remedy at law.

**COUNT V**

**AGAINST ALL THE INDIVIDUAL DEFENDANTS FOR AIDING AND
ABETTING FIDUCIARY VIOLATIONS**

193.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

194.   The wrongful conduct alleged herein was continuous, connected, and on-going since at least November 2014.   The Individual Defendants' misconduct resulted in continuous, connected, and on-going harm to the Company.

195.   The Individual Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements disseminated by Acadia and had the power and/or ability directly or indirectly to control or influence one another.

196.   Each Individual Defendant is jointly and severally liable to the same extent as any other Defendant is liable for breaches of fiduciary duties as set forth herein or violations of any other laws.

197.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

198.   Plaintiff, on behalf of Acadia, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment in the Company's favor, as follows:

A.   Against all Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, unjust enrichment, insider selling, and waste of corporate assets;

B.   Directing Acadia to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Acadia and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;
- a proposal to strengthen the Company's internal reporting and financial disclosure controls;
- a proposal to de-classify the Company's Board and calling for each director to stand for election to the Board annually;
- a provision to strengthen the Company's oversight and controls over insiders' purchase and sale of Company stock;
- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
- a provision to permit the shareholders of Acadia to nominate at least three candidates for election to the Board;
- a proposal to ensure the accuracy of the qualifications of Acadia's directors, executives and other employees;
- a provision to appropriately test and then strengthen the Company's internal operational control functions;

C.      Awarding to Acadia restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

**JURY DEMAND**

2          Plaintiff demands a trial by jury.

3

4   Dated: October 14, 2016                    JOHNSON & WEAVER, LLP
                                               FRANK J. JOHNSON
5                                              PHONG L. TRAN

6

7                                   By:  *s/Frank J. Johnson*

8                                        FRANK J. JOHNSON

9                                        600 West Broadway, Suite 1540
10                                       San Diego, CA  92101
                                         Telephone: (619) 230-0063
11                                       Facsimile: (619) 255-1856
12                                       FrankJ@johnsonandweaver.com
                                         PhongT@johnsonandweaver.com
13

14                                       Attorneys for Plaintiff
                                         ERIK SAVINI
15

16

17

18

19

20

21

22

23

24

25

26

27

28

73

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

DocuSign Envelope ID: 319D4AB6-D124-433D-8BB4-33E35189519E

# VERIFICATION

I, Erik Savini, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated:  October 11, 2016

DocuSigned by:

_____

2398DB4AF38F4D2...

(Signature of Erik Savini)